2011 Ark. 67

**Alicia BETHANY, Appellant**

v.

**Emily JONES, Appellee.**

**No. 10–295.**

Supreme Court of Arkansas.

Feb. 17, 2011.

Garnett, Naramore, Drake & Naramore, P.A., by: Wade T. Naramore and J. Joshua Drake, Hot Springs, for appellant.

Robertson Law Firm, Little Rock, by: Bonnie Robertson, for appellee.

DONALD L. CORBIN, Justice.

The instant matter involves a dispute over child visitation. Appellant Alicia Be-

thany, biological mother of minor child, E.B., argues on appeal that Appellee Emily Jones, Bethany's former same-sex partner, has no recognizable right entitling her to visitation with E.B. In support of her contention, she argues on appeal that the circuit court erred (1) in denying her motion to dismiss where Jones could not maintain any cause of action; (2) in denying her motion for directed verdict because there is no law in Arkansas that allows Jones to have visitation with the minor child; (3) in granting visitation under a theory of in loco parentis or equitable estoppel; and (4) in failing to transfer this case from Perry County to Garland County, where venue was proper. We granted Appellant's motion to transfer this case from the Arkansas Court of Appeals as it involves an issue of first impression; hence, our jurisdiction is pursuant to Ark. Sup.Ct. R. 1–2(b)(1) (2010). We affirm the order of the circuit court.

The facts are largely undisputed. Bethany and Jones were same-sex partners from 2000 until 2008. In 2003, the parties purchased a home together, with both of their names listed on the mortgage. Then, in 2004, the parties began to take steps toward having a family. A male friend of Jones's agreed to donate sperm. Bethany agreed to carry the child because Jones was experiencing some health issues, including reproductive problems. Through the process of artificial insemination, Bethany became pregnant, and the minor child was born in 2005. The couple chose to give the child Jones's last name and Jones's grandmother's name as the child's middle name. The testimony at trial revealed that Bethany and Jones intended to co-parent the child. In fact, Bethany testified that at the time of conception, she considered Jones to be E.B.'s parent.

After E.B.'s birth, the parties agreed that Jones would remain at home as the child's primary caregiver with Bethany returning to work on a full-time basis. E.B. referred to Bethany as "mama" and to Jones as "mommy." It was undisputed that E.B. formed close relationships with members of Jones's family, calling Jones's parents "Grammy" and "Poppy." Bethany was not close to either of her parents, and E.B. had little or no relationship with either of them.

In 2008, the parties ended their romantic relationship, but at that time agreed to continue co-parenting E.B. However, the situation between Bethany and Jones began to deteriorate. They had a disagreement over Jones keeping E.B. for a twenty-four-hour period, against Bethany's wishes. Bethany, who had entered into a relationship with another woman, decided that it was no longer in E.B.'s best interest to have contact with Jones because she questioned Jones's ability to parent, citing such factors as instability, depression, safety of the child, and truthfulness of Jones.

After Bethany denied Jones visitation with E.B., Jones filed the instant action for custody alleging breach of contract based upon equitable estoppel.[1] Bethany sought to have the complaint dismissed, arguing that Jones lacked standing to bring the suit, as there was nothing in Arkansas law that allowed her to seek visitation with E.B. Alternatively, she sought to have the case transferred to Garland County, claiming that the child resided in Hot Springs, Arkansas.

---

1. Originally, Jones filed an action for guardianship that was subsequently voluntarily dismissed.

A hearing on the motion was held on February 11, 2009. Counsel for Bethany argued that there was no basis in the law for the petition, as Jones was not a biological parent, nor was there any support for a finding that Jones stood in loco parentis to the child. On the contrary, Jones argued that she did stand in loco parentis and that there was ample statutory authority for awarding her custody of the child on that basis. Jones also argued that she and Bethany formed an agreement that they would have a child, that Jones would stay at home and take care of the child while Bethany worked, and that they would raise the child together. Jones asserted that Bethany breached that agreement and, thus, the court could fashion an equitable remedy for breach of an implied contract.

A second hearing was held on June 9, 2009, on a motion for summary judgment filed by Jones and a second motion to dismiss filed by Bethany. Jones argued that there was substantial evidence that she stood in loco parentis to E.B. She further argued that even though there was no statutory authority allowing a same-sex partner to seek custody or visitation with a minor child, the concept of in loco parentis was well recognized in Arkansas and allowed the circuit court to grant visitation from an equitable standpoint—as it was in E.B.'s best interest that her relationship with Jones continue. Bethany countered that there was no legal basis for visitation, as this situation was "no different than if a nanny decided they had become really close to a child and they wanted to file a case for custody." Bethany further argued that the fashioning of any remedy was a matter for the legislature.

A bench trial was held on October 30, 2009. Bethany testified that she met and began a relationship with Jones in 2000 and that the couple bought a home together in 2003. She stated that they lived together until November 2008. According to Bethany, she and Jones began discussing having a child together and met with a prospective sperm donor in 2004. They informed the potential donor, who was a friend of Jones's, that they did not expect him to have any kind of legal or emotional relationship with the child. At some point, the parties agreed that Bethany would carry the child because she was in better health physically. Jones was the one who actually inseminated Bethany. Bethany admitted that Jones went to every doctor's appointment with her and was present during E.B.'s birth. Bethany further stated that originally she gave the child the middle name Lillian, which was Jones's paternal grandmother's name, and Jones's last name but has since removed the name Lillian and changed her last name, via court order. Bethany denied being estranged from her family. She did admit, however, that prior to and after E.B.'s birth, she considered Jones to be a co-parent and that E.B. referred to Jones as "mommy." She also admitted that after the pair split, she intended to continue parenting with Jones. Bethany also testified about the incident that led her to stop Jones's visitation with E.B., claiming that Jones kept E.B. past the agreed-upon time for returning her. According to Bethany, Jones kept the child for over twenty-four hours after her visitation ended. Bethany stated that she thought this episode demonstrated that Jones was irrational and emotionally unstable and that visitation should no longer occur. Bethany admitted that E.B. thought of Jones's parents as her grandparents and spent all holidays with Jones's family. She also admitted that Jones stayed at home for over three years to take care of the child but denied that the child was traumatized by Jones no longer being in her life.

On cross-examination, Bethany testified that she worried about Jones's long-stand-

ing battle with depression. She opined that Jones lacked the ability to parent. She also stated that after E.B. was born, Jones was diagnosed with Chiari syndrome, a condition that causes migraine-like headaches, and that some days she was not able to take care of E.B. She also stated that in her opinion it was not in E.B.'s best interest to resume visitation because Jones had done nothing to rebuild her trust after the prior incident when she kept E.B. past the visitation deadline. Bethany opined that she did not think that Jones was fit and capable of |₆taking care of E.B. Finally, Bethany testified that she has been a resident of Garland County since the time that the instant action was filed and that she lives there with her partner, her partner's daughter, and E.B. Bethany stated that she considered her partner to be a stepparent to E.B.

Jones testified that she was E.B.'s caretaker for the first years of her life. She denied that she was unable to take care of the child because of her health. She stated that Bethany was always close to Jones's family. She stated that Bethany had issues with depression that worsened after E.B.'s birth. Jones stated that her mom would sometimes watch E.B. so that she could occasionally work outside the home. Jones explained that when she kept E.B. past the twenty-four-hour period she did so because she was concerned about Bethany's plan to put E.B. in a car for an extended amount of time to go to Dallas to see people E.B. did not know. Jones stated that she and Bethany had an oral agreement that they would raise the child together, and they never had any discussions about what would happen if they split up. Jones admitted that neither

she nor Bethany ever took any steps to legalize their relationship.

At the conclusion of the trial, the circuit court ruled from the bench that Jones had sustained her burden of proof to establish a relationship with E.B. based on the doctrine of in loco parentis. Thus, the court announced that it was going to allow Jones to have visitation. The circuit court further stated that it was in E.B.'s best interests to have a relationship with both women and their families.

|₇In a written order entered on November 24, 2010, the circuit court awarded Jones visitation rights. He relied, in part, on the case of *Robinson v. Ford–Robinson*, 88 Ark. App. 151, 196 S.W.3d 503 (2004), where the court of appeals affirmed a lower court's grant of visitation rights to a stepparent who stood in loco parentis.[2] The circuit court noted that the main difference between the instant case and *Robinson* was that in the latter, the parties were married but Arkansas law does not allow for same-sex marriage.

In so ruling, the circuit court made the following relevant findings:

> 22. The Plaintiff cared for the child's every need every day for three and one-half years. The Plaintiff fed, bathed, clothed, nurtured, supervised, and supported E.B., and performed every other act a parent would do for their child. The Plaintiff and Defendant agreed to co-parent the child, and the Plaintiff stood in loco parentis to the minor child to the exclusion of all others besides the Defendant.
>
> 23. The Court finds that the Plaintiff established that she stood in loco parentis to the minor child, as she stood not only in the position of a parent to the

---

**2.** This court granted a petition for review in *Robinson*, and affirmed the circuit court's order finding that the stepmother stood in loco parentis and was thus entitled to visitation with her stepson. *Robinson v. Ford–Robinson*, 362 Ark. 232, 208 S.W.3d 140 (2005).

child for three and one-half years, but the child saw the Plaintiff as her parent for those years. This relationship continued until the Defendant abruptly terminated the relationship and later eliminated any contact between the child and the Plaintiff.

Furthermore, the court agreed with Jones that Bethany should be estopped from denying Jones's in loco parentis status. The court also considered the best interests of the child, finding that it was in E.B.'s best interests to have visitation with Jones, as a parent-child relationship between E.B. and Jones had been created. The court also noted E.B.'s |₈relationship with Jones's family as support for the conclusion that it was in the child's best interest to grant visitation. From that order comes the instant appeal.

## I.  *Visitation*

Bethany's first three arguments on appeal, that Jones failed to state a cause of action, that there is no law in Arkansas that allows Jones to seek visitation, and that the doctrine of in loco parentis is inapplicable, are so intertwined that we will address them together. Essentially, Bethany argues for reversal on the sole basis that nothing in Arkansas law allows her former same-sex partner to seek visitation with the child born to Bethany during their relationship. Jones counters that the circuit court correctly determined that she stood in loco parentis to E.B. and properly awarded her visitation.

▪ Our analysis must begin with the fundamental notion that the Due Process Clause of the Fourteenth Amendment protects the rights of parents to direct and govern the care, custody, and control of their children. *See Troxel v. Granville*, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000) (plurality opinion) (declaring Washington State's grandparent-visitation act

unconstitutional as applied); *see also Linder v. Linder*, 348 Ark. 322, 72 S.W.3d 841 (2002) (holding that Arkansas's grandparent-visitation statute was unconstitutional as applied where it violated a mother's fundamental liberty interest under the due-process clause to parent her child). However, this court has distinguished the situation where a grandparent seeks visitation against a parent's wishes, explaining that in a case where a stepparent seeks visitation it is under the theory that he or she stood in loco parentis to the child rather than just having some type of relationship. |₉*Robinson*, 362 Ark. 232, 208 S.W.3d 140. We held that the finding of an in loco parentis relationship is different from the grandparent relationships found in *Troxel* and *Linder* because it concerns a person who, in all practical respects, was a parent. *Id.* Thus, any argument that Jones cannot seek visitation because to do so would interfere with Bethany's right to parent is unavailing. Moreover, our law is well settled that the primary consideration in child-custody cases is the welfare and best interest of the children; all other considerations are secondary. *Digby v. Digby*, 263 Ark. 813, 567 S.W.2d 290 (1978).

While the exact facts of this case are unique, we have cases discussing the doctrine of in loco parentis. Specifically, our decision in *Robinson*, 362 Ark. 232, 208 S.W.3d 140, offers some guidance. In *Robinson*, a stepmother petitioned for visitation with her stepson following a divorce from the child's father. The father objected to visitation. The child was two when the couple were married, and his father had sole legal custody after his mother relinquished her parental rights. In the divorce action, the wife initially sought custody of the child but subsequently amended her complaint to request visitation. The circuit court granted visitation finding

that the wife had stood in loco parentis to the child since he was eighteen months old, that he recognized her as his mother, and that it would be in his best interest to have visitation with his stepmom. We held that a circuit court may award visitation to a stepparent standing in loco parentis over the natural parent's objection. *Id.*[3]

This court discussed the concept of in loco parentis in *Robinson,* explaining as follows:

In *Standridge v. Standridge,* 304 Ark. 364, 803 S.W.2d 496 (1991), we cited Black's Law Dictionary (5th ed.1979) defining *"in loco parentis"* as "in place of a parent; instead of a parent; charged factitiously with a parent's rights, duties, and responsibilities." In *Moon Distributors v. White,* 245 Ark. 627, 434 S.W.2d 56 (1968), we permitted a wrongful-death award to a decedent's stepdaughter to whom the decedent stood *in loco parentis,* noting that the stepdaughter lived in the home with her stepmother "as mother and daughter." Finally, this court has treated grandparents who stood *in loco parentis* differently from grandparents who did not. *See Johnson v. Tompkins,* 341 Ark. 949, 20 S.W.3d 385 (2000). In *Johnson,* we held that the grandparents had no right to present evidence on whether adoption would be in their grandchild's best interest. *Id.* We distinguished our decisions in *Quarles v. French,* 272 Ark. 51, 611 S.W.2d 757 (1981), and *Cox v. Stayton,* 273 Ark. 298, 619 S.W.2d 617 (1981), in which we held that grandparents had standing to intervene in adoption proceedings involving their grandchildren, because the grandparents in those cases

stood *in loco parentis* to their grandchildren. We hold that a court may award visitation to a stepparent who stands *in loco parentis* to a minor child when it determines that it is in the best interest of the child.

*Id.* at 239–40, 208 S.W.3d at 144. Thus, the doctrine of in loco parentis focuses on the relationship between the child and the person asserting that they stood in loco parentis. Bethany on the other hand seems to argue that because Arkansas does not recognize same-sex marriage or grant domestic-partnership rights, Jones has no legal standing to assert that she stood in loco parentis. In other words, Bethany focuses on her relationship with Jones instead of looking at the relationship between Jones and E.B. There is nothing in our decision in *Robinson* to support Bethany's assertion in this regard. Although this court in *Robinson* noted the fact that the visitation issue arose in the context of a divorce proceeding, this court stated that "critical" to its review was the fact that the circuit court found that the stepmother stood in loco parentis to the minor child. *Id.* at 239, 208 S.W.3d at 143. We reiterate that the focus should be on what, if any, bond has formed between the child and the nonparent.

Thus, we must now determine whether the circuit court's finding that Jones stood in loco parentis was clearly erroneous, as we review domestic-relations cases de novo on the record. *Robinson,* 362 Ark. 232, 208 S.W.3d 140. We will not reverse a finding by the circuit court unless it was clearly erroneous. *Stills v. Stills,* 2010 Ark. 132, 361 S.W.3d 823. We have further stated that a finding of fact

**3.** In *Robinson,* we also rejected the appellant's argument that the holding in *Stamps v. Rawlins,* 297 Ark. 370, 761 S.W.2d 933 (1988)—that a stepparent could be awarded custody of a minor child, although the preference for a natural parent must prevail unless it is established that the natural parent is unfit—had been overruled. That case remains good law today.

by a circuit court is clearly erroneous when, despite supporting evidence in the record, the appellate court viewing all of the evidence is left with a definite and firm conviction that a mistake has been committed. *Id.* We give due deference to the superior position of the circuit court to view and judge the credibility of the witnesses. *Hunt v. Perry,* 357 Ark. 224, 162 S.W.3d 891 (2004). This deference to the circuit court is even greater in cases involving child custody or visitation, as a heavier burden is placed on the circuit court to utilize to the fullest extent its powers of perception in evaluating the witnesses, their testimony, and the best interest of the children. *Alphin v. Alphin,* 364 Ark. 332, 219 S.W.3d 160 (2005).

■ Considering the ample evidence about the relationship between Jones and E.B., we cannot say that the circuit court clearly erred in finding that she stood in loco parentis to the child. It was undisputed that she was the stay-at-home mom for over three years who took care of E.B. E.B. called her mommy. She thought of Jones's parents as her grandparents and spent holidays with Jones's family. The parties' intentions were always to co-parent, until Bethany unilaterally determined she no longer wanted to allow Jones to have visitation. Taking this all into consideration, we hold that the circuit court correctly determined that Jones was a parent figure to E.B.

■ Having determined that Jones stood in loco parentis, the question then becomes whether it is in E.B.'s best interest for Jones to have visitation rights, as that is the polestar consideration. *See, e.g., Hudson v. Kyle,* 365 Ark. 341, 229 S.W.3d 890 (2006); *Alphin,* 364 Ark. 332, 219 S.W.3d 160. Here, the circuit court found that it was in E.B.'s best interest to have visitation with Jones. Specifically, the circuit court found that

it is in [E.B.]'s best interest for the Plaintiff to have visitation with her. For all of the reasons stated above, it is clear that the Plaintiff was [E.B.]'s *primary* caregiver. A parent-child relationship between [E.B.] and the Plaintiff was deeply established, as were relationships between the child and the Plaintiff's extended family, involving the Plaintiff's mother and father and step-mother and other family members. The Defendant was estranged from her family during most of this time, so the only support provided to the child came from the Plaintiff, the Defendant and the Plaintiff's extended family.

42. Finally, the Court questions the Defendant's veracity as to her assertion that [E.B.] has not exhibited any kind of behavior or emotion which would indicate she has been negatively affected by [E.B.]'s abrupt separation from the Plaintiff. Up to this point, [E.B.] has spent most of her life in the Plaintiff's care, and based upon the loving relationship that they formed, shared and enjoyed, it would be in [E.B.]'s best interest to continue to have contact with the Plaintiff.

Clearly, the circuit court weighed the testimony presented and considered the great weight of evidence regarding Jones's care for E.B., the parent-child relationship formed between Jones and the child, and the child's relationships with Jones's family, to determine that it was in E.B.'s best interest to allow Jones's visitation. As we previously stated, we give due deference to the circuit court's ability to view and judge the credibility of the witnesses. *Hunt,* 357 Ark. 224, 162 S.W.3d 891. Accordingly, we cannot say that the circuit court erred in ruling that it was in E.B.'s best interest to have visitation with Jones.

Before leaving this point, we note that Bethany makes several arguments that if

we allow the nonbiological parent in this case to stand in loco parentis or to seek any visitation or custody rights to this child, it will open a floodgate that allows any person, i.e., a nanny, a babysitter, a girlfriend or boyfriend to go into court and seek custody of a child. We find this argument unavailing. In fact, the Kentucky Supreme Court in *Mullins v. Picklesimer*, 317 S.W.3d 569 (Ky.2010), in a case factually similar to the instant one, rejected any such open-floodgate argument by noting the specific facts of the case as follows:

> In the present case, the child was conceived through artificial insemination and brought into the world upon agreement of the parties to parent the child together. It was undisputed that Mullins physically cared for and supervised Zachary from birth throughout the period the parties were together and for the five months thereafter when they shared custody. And she did so in the capacity of a parent, which is evidenced by her living as a family with the child and Picklesimer, the child calling her "momma," the child's hyphenated surname (Picklesimer–Mullins), the parties' attempt to confer parental rights on Mullins with the agreed judgment of custody, and Picklesimer continuing to allow Mullins to co-parent to the child for some five months after the parties' relationship dissolved.

*Id.* at 576–77. After reciting these pertinent facts, the Kentucky court concluded that the case was distinguishable from the situation where there is a grandparent, a babysitter, or a boyfriend or girlfriend of the parent, who watched the child for the parent, but who was never intended by the parent to be doing so in the capacity of another parent. *Id.*

The only significant factual difference between this case and *Mullins* is that in the latter, the parties, while still together, attempted to obtain a legal agreement regarding custody and legal rights between the partner and the minor child. No written agreement was ever entered into between the parties in this case, although the evidence is undisputed that it was the intent of both Bethany and Jones to co-parent E.B. Our holding in the instant case that the circuit court did not clearly err in finding that Jones stood in loco parentis to E.B. and that it was in E.B.'s best interest to allow visitation with Jones is grounded in the specific facts of this case. Thus, there is no merit to Bethany's contention that this case will open the floodgates to allow anyone to seek visitation with a minor child.[4]

## II. *Motion to Transfer*

■ Finally, Bethany argues that the circuit court erred in denying her motion to transfer the case to Garland County, as

---

4. Justice Baker, like Appellant, is trying to make this case into something it is not. Her dissent operates under the false premise that this is a statutory-interpretation case. This is quite simply a visitation issue wherein the circuit court granted visitation based on findings that Jones stood in loco parentis to E.B. and that it was in E.B.'s best interests to have visitation with the woman who had helped raise her for the first three years of her life. Justice Baker's dissent attempts to circumvent stare decisis by referring to the common-law doctrine of in loco parentis as "an interpretive tool." We will not place such an artificial restriction on the doctrine in order to achieve a certain result. Notably, Justice Baker never once discusses the best interests of the child, which is the polestar consideration in a case such as this one. Moreover, in the absence of any compelling reason to do so, we will not retreat from our decision in *Robinson*, 362 Ark. 232, 208 S.W.3d 140. Guided by our decision in that case, we reviewed the sole question of whether the circuit court correctly granted visitation in the instant case. We are not creating new law; rather, we are adhering to the doctrine of stare decisis.

she and E.B. resided in Hot Springs at the time the action was filed and, thus, venue did not lie in Perry County. In support of her contention, she argues that, prior to filing the instant action, Jones filed a guardianship action in Garland County. Further, she points out that the circuit court in its order stated that after terminating her relationship with Jones, Bethany moved in with another partner in Hot Springs. Bethany then concludes, without any citation to authority, that the circuit court clearly erred in denying the motion to transfer for proper venue. It is well settled where a party fails to cite to authority, this court will not consider the argument on appeal. *See Matsukis v. Joy*, 2010 Ark. 403, 377 S.W.3d 245.

Nevertheless, Bethany's argument on this point is without merit. The standard of review on appeal of a denial of a motion to transfer is whether the circuit court abused its discretion. *Jones v. Billingsley*, 363 Ark. 96, 211 S.W.3d 508 (2005). Here, the court denied the motion to transfer by order entered of record on July 27, 2010, finding that Bethany was a resident of Perry County at the time the original cause of action was filed on December 9, 2008. Bethany presented no proof, other than her bare assertion, that she had moved her legal residence to Garland County prior to the filing of this action. Absent such proof, we cannot say that the circuit court abused its discretion in denying the motion to transfer the case to Garland County.

Affirmed.

BAKER and HENRY, JJ., dissent.

KAREN R. BAKER, Justice, dissenting.

There are two competing interests in this appeal: (1) a fit parent's right to exclude a former romantic partner from having any visitation with her minor child after the relationship ended; and (2) a former romantic partner's right to have court-ordered visitation premised upon standing in loco parentis to the minor child during the course of the romantic relationship. The majority focuses on numerous facts regarding the parties' history in this case, seemingly as a basis upon which to craft a new judicial right of visitation for Jones. Yet, the opinion fails to furnish any meaningful analysis of Bethany's right to parent her child as she sees fit. That omission, fostered by the trial court and advanced by the majority, creates the impression that Bethany and Jones have equal legal footing in this dispute; however, they do not.

A parent's Fourteenth Amendment guarantee of due process of law in the right to have and raise children was reaffirmed in *Troxel v. Granville*, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). In *Troxel*, Justice O'Connor, speaking for four Justices in the plurality decision, summarized the Court's approach to governmental intrusions on the parent-child relationship:

[T]he interest of parents in the care, custody, and control of their children ... is perhaps the oldest of the fundamental liberty interests recognized by this Court. More than 75 years ago, in *Meyer v. Nebraska*, 262 U.S. 390, 399, 401, 43 S.Ct. 625, 67 L.Ed. 1042 (1923), we held that the "liberty" protected by the Due Process Clause includes the right of parents to "establish a home and bring up children" and "to control the education of their own." Two years later, in *Pierce v. Society of Sisters*, 268 U.S. 510, 534–535, 45 S.Ct. 571, 69 L.Ed. 1070 (1925), we again held that the "liberty of parents and guardians" includes the right "to direct the upbringing and education of children under their control." We explained in *Pierce* that

"[t]he child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations." *Id.*, at 535, 45 S.Ct. 571. We returned to the subject in *Prince v. Massachusetts*, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944), and again confirmed that there is a constitutional dimension to the right of parents to direct the upbringing of their children. "It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." *Id.* at 166, 64 S.Ct. 438.

In subsequent cases also, we have recognized the fundamental right of parents to make decisions concerning the care, custody, and control of their children.... In light of this extensive precedent, it cannot now be doubted that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children.

*Troxel*, 530 U.S. at 65–66, 120 S.Ct. 2054. In *Troxel*, the United States Supreme Court wrestled with the balance between a state statute that granted grandparents the right to petition for visitation and a parent's Fourteenth Amendment due-process liberty interest in parenting a child without undue state interference. The Washington statute read: " 'Any person may petition the court for visitation rights at any time including, but not limited to, custody proceedings. The court may order visitation rights for any person when visitation may serve the best interest of the child whether or not there has been any change of circumstances.' " *Id.* at 61, 120 S.Ct. 2054 (quoting Wash. Rev.Code § 26.10.160(3) (1994)). Justice O'Connor articulated the three factors relied upon to support the decision that the statute infringed upon a parent's fundamental rights. *Id.* at 65–66, 120 S.Ct. 2054. First, there had been no finding of parental unfitness to defeat the traditional "presumption that fit parents act in the best interests of their children." *Id.* at 68, 120 S.Ct. 2054. Second, the trial court had failed to accord any special weight to the parent's determination of her own child's best interests. *Id.* at 69, 120 S.Ct. 2054. Third, the court noted that there had been no allegation that visitation had been denied entirely. *Id.* at 71, 120 S.Ct. 2054. The Court decided that "the Due Process Clause does not permit a State to infringe on the fundamental right of parents to make child rearing decisions simply because a *state judge* believes a 'better' decision could be made." *Id.* at 72–73, 120 S.Ct. 2054 (emphasis added).

The majority glosses over *Troxel* and barely touches upon *Linder v. Linder*, 348 Ark. 322, 72 S.W.3d 841 (2002). In *Linder*, this court relied on the fundamental-rights analysis from *Troxel* to hold that the Arkansas Grandparent Visitation Act (GPVA), codified at Ark.Code Ann. § 9–13–103, was unconstitutional as applied to the appellant:

It appears that the trial court found Lea Ann to be a fit parent for all purposes save one: making the decision about Brandon's relationship with his paternal grandparents. This finding of fitness is corroborated by the court's grant of custody to her and his remarks about her suitability as a parent and her loving bond with Brandon.... The question then becomes whether unfitness solely to decide visitation matters is a compelling interest on the part of the State that warrants intrusion on a parent's fundamental parenting right and overcomes the presumption in the par-

ent's favor. We conclude that it is not. So long as Lea Ann is fit to care for Brandon on a day-to-day basis, the Fourteenth Amendment right attaches, and the State *may not interfere without a compelling interest to do so.* As Justice O'Connor wrote in *Troxel,* the State must accord "special weight" to the mother's decision so long as she is a fit mother. *See Troxel,* 530 U.S. at 68–69, 120 S.Ct. at 2061.

*Linder,* 348 Ark. at 351, 72 S.W.3d at 857 (emphasis added). Without the foregoing legal framework to begin reviewing this appeal, it is understandable that the majority found support for its decision in *Robinson v. Ford–Robinson,* 362 Ark. 232, 208 S.W.3d 140 (2005), where this court granted visitation to a stepmother who stood in loco parentis to the minor child. Interpreting *Robinson,* the majority states that "this court stated that 'critical' to its review was the fact that the circuit found that the stepmother stood in loco parentis to the minor child." The language does come from *Robinson,* but when viewed in its proper context, it is clear that it is inapposite.

First, the visitation rights in this case arose out of a custody determination in a divorce proceeding rather than from a lawsuit brought by nonparents pursuant to a statute. Visitation was incident to and part of the circuit court's determination of custody. Morever, and critical to our review in this case, the party awarded visitation in this case was found by the circuit court to stand *in loco parentis* to the child. In other words, the court granted visitation to a person it considered to be, in all practical respects, a non-custodial parent.

*Id.* at 239, 208 S.W.3d at 143–44. In plain terms, the *Robinson* court stated that the visitation in that case arose during a divorce proceeding and not pursuant to a statute. Jones's request for visitation is not brought pursuant to a statute, nor is it sought during the course of a divorce proceeding. Now, *any* person in Arkansas can petition a court for visitation with a minor child over the objection of the parent. The majority found this argument unavailing, and in reliance on *Mullins v. Picklesimer,* 317 S.W.3d 569 (Ky.2010), stated that this case "was distinguishable from the situation where there is a grandparent, a babysitter, or a boyfriend or girlfriend of the parent, who watched the child for the parent, but who was never intended by the parent to be doing so in the capacity of another parent." Yet, any of the above-referenced persons can assert that they stand in loco parentis to a minor child, compelling the parent to undertake the burden of defending against such actions. The burden of litigating a domestic-relations case can itself be so disruptive of the parent-child relationship that it infringes on the parent's constitutional right to make basic determinations regarding the child's welfare. *Troxel,* 530 U.S. at 101, 120 S.Ct. 2054 (Kennedy, J., dissenting). The majority demonstrates that this burden is substantial as almost one-half of its opinion is devoted to the history of this case.

Moreover, the majority's reliance on *Robinson* is misplaced because *Robinson* is an anomaly in our law and should be limited to its facts. Justice Glaze's dissent in *Robinson* correctly pointed out that the holding was contrary to *Troxel* and *Linder.* The court in *Linder* adopted the Supreme Court's plurality opinion in *Troxel,* which required heightened review of any state infringement upon a parent's fundamental right concerning his or her child's care, custody, and control. *Linder* also clearly rejected a compartmental view of fitness—such that a parent could be fit for every other decision regarding a child but be unfit for decisions concerning with

whom the child associates. Following the compartmental view, if a court disagreed with a fit parent's decision of what is in a child's best interest, the court's view would necessarily prevail. A determination based solely on the judge's opinion of what is in the child's best interest makes it possible to disregard and overturn *any* decision by a fit custodial parent concerning visitation whenever a third party affected by the decision files a petition for visitation. *Robinson,* 362 Ark. at 242, 208 S.W.3d at 145 (Glaze, J., dissenting).

The *Robinson* court found that the stepmother stood in loco parentis, and used that finding to disregard the father's decision to deny his ex-wife visitation with his minor son—without discussing the weight that must be given to the father's decision to deny visitation. Likewise, the majority gives no deference to Bethany's decision to exclude Jones from her child's life and erroneously holds that our standard of review permits it to determine what is in the best interest of E.B. Infringement of a parent's fundamental right to parent a child premised upon a third person standing in loco parentis runs counter not only to our holdings in *Troxel* and *Linder,* but also to our law regarding the significance of standing in loco parentis.

A close examination of our cases reveals that this court has never granted standing to seek visitation *solely* on the basis of in loco parentis status. In those cases where we have discussed in loco parentis, such status was used only as an interpretive tool to facilitate the inquiry about who stands in loco parentis.[1] The cases cited by the majority regarding in loco parentis support this view. Thus, the majority opinion has no support in the cases it claims to be relying upon, and it completely rejects our holding in *Department of Human Services v. Howard,* 367 Ark. 55, 238 S.W.3d 1 (2006), that "[i]n order to establish standing, a party must show that he has a right which a statute infringes upon and that he is within the class of persons affected by the statute." *Id.* at 59, 238 S.W.3d at 4; *see also Thompson v. Arkansas Social Servs.,* 282 Ark. 369, 669 S.W.2d 878 (1984).

A review of the history of our law regarding grandparent visitation would be helpful to an understanding that the majority's position is not a logical extension of prior case law. In the context of a grandparent seeking visitation, we have held that "under the general law there is no right of visitation enforceable by injunction in favor of a grandparent with respect to a grandchild when a natural parent having custody resists or objects." *Veazey v. Stewart,* 251 Ark. 334, 335, 472 S.W.2d 102, 103 (1971). In *Quarles v. French,* 272 Ark. 51, 611 S.W.2d 757 (1981), the court stated, "At common law, a grandparent could not maintain an action for visitation rights to a grandchild except as a party to a custody proceeding." *Id.* at 54, 611 S.W.2d at 758. The rationale behind this rule was discussed in *Cox v. Stayton,* 273

1. *See, e.g., Pinder v. State,* 357 Ark. 275, 166 S.W.3d 49 (2004) (when the assailant stands in loco parentis to a rape victim, the law regarding force is satisfied with less than a showing of the utmost physical resistance); *Carpenter v. Bishop,* 290 Ark. 424, 720 S.W.2d 299 (1986) (parent or person acting in loco parentis is immune from suit for an unintentional injury to his child but not for an intentional injury to that child); *Thomas v. Inmon,* 268 Ark. 221, 594 S.W.2d 853 (1980) (unemancipated minor may not hold a parent or person standing in loco parentis liable for involuntary tort committed against him); *Moon Distributors, Inc. v. White,* 245 Ark. 627, 434 S.W.2d 56 (1968) (wrongful-death award to decedent's stepdaughter to whom the decedent stood in loco parentis permitted); *Gillespie v. Holland,* 40 Ark. 28 (1882) (lease set aside due to undue influence where lessee/brother stood in loco parentis to lessor/sister).

Ark. 298, 619 S.W.2d 617 (1981), an adoption case:

> What the appellants ask us to do through this line of argument is to recognize some form of inherent "grandparental rights" beyond those previously bestowed. This we decline to do, not out of disregard for the genuine relational ties which naturally exist between grandparents and grandchildren, but rather for the reason that the sanctity of the relationship between the parent and child must be the overriding concern. To create new, enforceable rights in grandparents could lead to results that would burden rather than enhance the welfare of children.

*Id.* at 304, 619 S.W.2d at 621. It was only after the legislature gave grandparents statutory standing to petition for visitation that we recognized the enforcement of such rights. *Cf. Poe v. Case,* 263 Ark. 488, 565 S.W.2d 612 (1978) (probate court had no jurisdiction to award visitation to grandparents in an adoption decree but proper court could grant grandparents visitation pursuant to statute).

Expanding third-party-visitation rights by statute limits the intrusion upon the parent-child relationship as recognized by Justice O'Connor in *Troxel:*

The nationwide enactment of nonparental visitation statutes is assuredly due, in some part, to the States' recognition of these changing realities of the American family. Because grandparents and other relatives undertake duties of a parental nature in many households, States have sought to ensure the welfare of the children therein by protecting the relationships those children form with such third parties. The States' nonparental visitation statutes are further supported by a recognition, which varies from State to State, that children should have the opportunity to benefit from relationships with statutorily specified persons—for example, their grandparents. The extension of statutory rights in this area to persons other than a child's parents, however, comes with an obvious cost. For example, the State's recognition of an independent third-party interest in a child can place a substantial burden on the traditional parent-child relationship.

*Troxel,* 530 U.S. at 64, 120 S.Ct. 2054.

The majority's holding ignores these fundamental principles.[2] The statute at issue in *Troxel* applied to anyone petitioning for visitation, even during divorce pro-

---

[2] The majority's decision continues the erosion of parental rights recently seen in *Fletcher v. Scorza,* 2010 Ark. 64, 359 S.W.3d 413, wherein we held that "in guardianship matters, the natural-parent preference is but one consideration, which is subservient to the principle that the child's best interest is the paramount consideration." *Id.* at 14, 359 S.W.3d at 421. To reach that conclusion, this court stated, "to the extent that any of our prior cases suggest a standard of fitness or unfitness in guardianship proceedings involving the statutory natural-parent preference, we overrule them." *Id.* at 13, 359 S.W.3d at 421. One of the "prior cases" specifically discussed in *Fletcher* was *Devine v. Martens,* 371 Ark. 60, 263 S.W.3d 515 (2007). There, we stressed that the courts of this state should not be in the business of permanently removing children from their parents simply because of poor judgment, especially after the parent has rectified the issue(s) calling into question his/her fitness. *Id.* Because *Troxel* and *Linder* require that some special weight be given to the decisions of fit parents as against any interests of third parties, state courts are precluded from substituting their judgments for that of the parent. *See Troxel,* 530 U.S. at 68–69, 120 S.Ct. 2054; *Linder,* 348 Ark. at 344–45, 72 S.W.3d at 854. When fitness is not in issue, then, the state's intrusion, which includes courts, must be for a compelling interest. *See Troxel,* 530 U.S. at 68–69, 120 S.Ct. 2054; *Linder,* 348 Ark. at 351, 72 S.W.3d at 857.

ceedings. *See* Wash. Rev.Code § 26.10.160(3) (1994). Thus, it cannot be said that the Supreme Court's decision is restricted to grandparent-visitation statutes. It would be absurd to argue that, as against a grandparent, a parent's decision is subject to scrutiny; but, as against a legal and biological stranger, such as Jones, a parent's decision is entitled to no deference. Today's opinion circumvents the guiding principles that restrict intrusion upon the parent's fundamental right to determine with whom his or her child associates.

In *Linder*, we stated that it was for the legislature to cure any defects in the statute. *Linder*, 348 Ark. at 355, 72 S.W.3d at 859–60. Having abstained from rewriting an existent statute conferring the right to visitation upon a grandparent, we necessarily must decline to create a nonexistent body of law regarding persons that the legislature has not identified as having rights to visitation. However, the majority confers standing on a party who has not been afforded the right to visitation by this state's legislature. This court has recognized the presumptive effect to be given to a parent's wishes under *Troxel*, and has struck down the grandparent-visitation statute for failing to recognize that presumption. *Linder*, 348 Ark. at 350, 72 S.W.3d at 856. As the third-party right to visitation granted by the majority is a new cause of action, it should come from the legislature, not this court. *See Wilbur v. Kerr*, 275 Ark. 239, 628 S.W.2d 568 (1982); *cf. Cockman v. Welder's Supply Co.*, 265 Ark. 612, 580 S.W.2d 455 (1979); *Ford Motor Co. v. Reid*, 250 Ark. 176, 465 S.W.2d 80 (1971).

I would reverse and dismiss.

COURTNEY HUDSON HENRY, Justice, dissenting.

I respectfully dissent. I write separately to take the position that I articulated in

*Fletcher v. Scorza*, 2009 Ark. App. 372, 2009 WL 1232100, *rev'd*, 2010 Ark. 64, 359 S.W.3d 413, in favor of a fit, natural parent to make decisions regarding the upbringing of his or her own children.