Cite as 2025 Ark. App. 428

# ARKANSAS COURT OF APPEALS
## DIVISION III
No. CV-24-110

| | |
|---|---|
| LISA ROUSE, AS ADMINISTRATOR OF THE ESTATE OF BILLY RAY WAYMON; AND LISA ROUSE, APRIL LUNSFORD, AND SHELLEY WILLIAMS, INDIVIDUALLY<br><br>APPELLANTS/CROSS-APPELLEES<br><br>V.<br><br>JOHN WESLEY TIPPIT, TIMOTHY L. TIPPIT, STEVAN C. TIPPIT, AND ROBERT E. TIPPIT<br>APPELLEES/CROSS-APPELLANTS | Opinion Delivered September 17, 2025<br><br>APPEAL FROM THE CLAY COUNTY CIRCUIT COURT, WESTERN DISTRICT<br><br>[NO. 11CPR-23-3]<br><br>HONORABLE MARY LILE BROADAWAY, JUDGE<br><br>AFFIRMED ON DIRECT APPEAL; AFFIRMED ON CROSS-APPEAL |

## CASEY R. TUCKER, Judge

Appellants Lisa Rouse, as administrator of the estate of Billy Ray Waymon; and Lisa Rouse, April Rouse Lunsford (the "Rouses"), and Shelley Williams[1] ("Shelley"), individually, appeal from the order entered October 18, 2023, dividing the proceeds of a wrongful-death lawsuit brought on behalf of the estate of Billy Ray Waymon (the "Estate"). Specifically, the appellants appeal the ruling that John Wesley Tippit, Timothy Lawton Tippit, Edward Tippit

---

[1]Shelley is the biological child of Timothy Lawton Tippit, but throughout the proceedings, the Rouses maintained that Waymon had adopted her. The issue of the adoption was dropped at the final hearing. Both parties agreed Shelley had an *in loco parentis* relationship with Waymon.

and Stevan Tippit (the "Tippits") had an *in loco parentis* relationship with the decedent, Billy Ray Waymon ("Waymon") entitling them to a portion of the wrongful-death proceeds received as the result of Waymon's death in a car collision. We affirm.

The Tippits filed a cross-appeal of the judgment awarding a portion of wrongful-death proceeds to the appellants. The Tippits assert that the appellants did not put on any evidence of damages at the hearing on the distribution of the wrongful-death proceeds, and because they failed to put on such evidence, they are not entitled to receive any wrongful-death proceeds. We affirm.

## I. *Facts*

In 1970, Lois Howard, the mother of the Tippits and the Rouses, began living with Waymon in Corning, Arkansas. The father of the four Tippit boys, Oval Tippit, lived in Missouri. The Tippits ranged in age from eleven to seventeen when Waymon came into their lives. Lisa was a toddler, and Lois was pregnant with April, who was born in 1970, when Waymon moved in with Lois. Lois and Waymon married in 1975 and lived as husband and wife until they divorced in 2010. Waymon passed away as the result of a car collision on January 11, 2023. Waymon had no surviving spouse or descendants. On January 17, Waymon's stepson, John Wesley Tippit ("Wesley") filed a petition with the Clay County Circuit Court to name himself as personal representative of Waymon's estate.

In the petition, Wesley averred that Waymon was survived by seven heirs at law by virtue of each being in an *in loco parentis* relationship with Waymon,[2] which included the Rouses, the Tippits and Shelley. By order dated January 25, 2023, Wesley was appointed as administrator of Waymon's estate, and, upon filing of his acceptance, letters of administration were issued.

On February 2, Lisa Rouse filed a petition to revoke the order appointing Wesley and all court actions after that appointment, stating that she had no notice of the proceedings appointing Wesley, and more importantly, none of the Tippits had *in loco parentis* relationship with Waymon. Lisa's petition to revoke also stated that she, April, and Shelley had been in an *in loco parentis* relationship with Waymon. Lisa Rouse then filed her own petition (and subsequently her amended petition) seeking her appointment as administrator of Waymon's estate. Shelley, who was purported to have been adopted by Waymon, consented to Lisa's appointment.[3]

A hearing on the amended petition to revoke was held on February 27. The parties announced a settlement following a brief recess. On May 1, the court issued an order based

---

[2]As is discussed in the initial probate pleadings, a person claiming an *in loco parentis* relationship with a decedent does not have any priority under the Arkansas statutes prioritizing persons who serve as administrators of estates. This issue and the hearing surrounding the appointment are not relevant to the issues on appeal, but there were certain facts gleaned from that hearing prior to the agreement reached between the parties.

[3]The petition stated that Shelley was disabled and unable to serve.

on the agreement of the parties removing Wesley as administrator and appointing Lisa as administrator.

The May 1 order stated that Waymon stood *in loco parentis* with Shelley, and there was "no dispute" that she is an "heir." The issue of whether Waymon stood *in loco parentis* with the Rouses or the Tippits and whether they were "heirs"[4] (under the wrongful-death statute) was reserved for a hearing.

In a July 10 order, upon petition of the administrator, the court approved the settlement of the wrongful-death claim. Three separate policies paid the claim totaling $135,000, including $5000 in death benefits and $5000 in medical-benefits coverage.[5] In that same order, the court reiterated: "It is agreed that Shelley Williams was *in loco parentis* and is an heir. A hearing is requested to determine additional heirs and to distribute funds."

At the hearing held on August 29, the parties stipulated that Lisa and April qualified as beneficiaries under Ark. Code Ann. § 16-62-103(d)(3) (Repl. 2005) because they had been in an *in loco parentis* relationship with Waymon during his lifetime. The sole issue for the court to decide was whether the Tippits met the definition of a wrongful-death beneficiary under Ark. Code Ann. § 16-62-103(d)(3): "*persons, regardless of age, to whom the deceased stood in loco parentis at any time during the life of the deceased.*"

---

[4]The court used the term "heirs," but under the Wrongful Death Act, however, they should be called "beneficiaries." The parties also adopt the term "heirs" in their briefs. For purposes of this appeal, the parties will be referred to as beneficiaries.

[5]After payment of the attorneys' fees and costs, the net proceeds available for distribution to the beneficiaries was $89,607.62.

All four Tippits testified at the hearing about their individual relationships with Waymon, both as minors and as adults–even after their mother divorced Waymon. Though the Tippits graduated from high school in Missouri where Oval lived, Oval was in poor health, which caused them to spend a great deal of time in Corning with Lois and Waymon.

They all testified as to how Waymon provided for them, disciplined them, taught them various trades, participated in hobbies with them, and treated them like sons. In return, the Tippits described that as adults, they spent time with Waymon and even helped him financially over the years.

Wesley Tippit testified he lived with Lois and Waymon in 1970–1971. While Wesley returned to live with his father, Oval, in Missouri after those two years, he continued to live at Waymon and Lois's home approximately five months out of the year until he turned eighteen. After he turned eighteen, he moved in with Lois and Waymon, where he lived and worked alongside Waymon. Wesley testified that while Oval was very poor, Waymon and Lois were able to support the boys, including giving them an allowance. Wesley testified that they purchased his first vehicle. Waymon taught Wesley how to drive a vehicle and a tractor, operate farm equipment, mix mortar, lay brick, lay rock, operate a chainsaw, and perform carpentry work. He enjoyed hunting and fishing with him. He also described an incident in which Waymon saved his life when he kept him from stepping on a rattlesnake. Wesley stated that even after the divorce, he would take off work and go spend time with Waymon every deer season. He last spoke to Waymon just a few hours before he passed away.

Timothy Tippit testified that he lived with Waymon and Lois for three years before he turned eighteen. Waymon taught him how to drive and how to work on the farm, and he hunted and fished with him. Timothy served in the army for seven years, but when he was discharged, he lived with Waymon and Lois. Timothy called Waymon "Pops" and Waymon called him "Son," and he testified about a relationship that continued over the years even after both of his parents had passed away. Timothy testified that all the Tippits helped Waymon financially as they got older. Timothy last spoke to Waymon an hour and a half before his death. Timothy testified that Waymon's death had devasted all of the boys.

Stevan Tippit was fourteen or fifteen years old when Waymon moved in with Lois. He testified that he lived with them in the summers and visited them on the three- and four-day weekend breaks during school. He called Waymon his "father" and stated that Waymon provided him with guidance and discipline. Stevan testified that he and Waymon enjoyed hunting, fishing, and running traps together. Waymon also taught Stevan how to cut wood. According to Stevan, Waymon provided for the Tippits by giving them an allowance and buying them clothes. When Stevan turned eighteen, he would visit Waymon and Lois on the weekends. As an adult, he continued to help Waymon and Lois around the house by doing things like building them a barn and running a fence line for them on their property.

Eddie Tippit was the oldest boy and was seventeen when Waymon entered his life. He testified that Waymon was the only grandfather his children had ever known. "He was a father figure, on every level, to everybody." He lived with Waymon and Lois until he was about to turn twenty years old. Eddie stated that Waymon and Lois financially supported

the boys by giving them food and clothing. Eddie joined the U.S. Air Force and was gone for about two years. Upon his return, he and his children moved back in with Waymon and Lois.  When he retired in 2015, he moved back to Arkansas. Eddie stated he and Waymon were the closest they had ever been when Waymon died. They saw each other weekly and celebrated the holidays together. Eddie testified that he gave Waymon money for his birthday and Christmas. He had last seen Waymon two days before his death when they had dinner together.

## II.  *The Order*

The Court's October 18, 2023 order provided as follows:

> 1. The decedent had six step-children, and one step-granddaughter that was alleged to have been adopted. The six individuals stipulated that the two stepdaughters and "adopted" grand-daughter had attained the status of being in loco parentis with the decedent. The controlling statute is A.C.A. 16-62-102(d)(3) which states "The beneficiaries of the action created in this section are:  Persons, regardless of age, to whom the deceased stood in loco parentis at any time during the life of the deceased."

> 2. The step-daughters take the position that the step-sons should not benefit because their relationships did not rise to the level of in loco parentis and cite the cases of *Zulpo vs. Blann*, 2013 Ark App 750, and *Williams vs. Davis*, 2021 Ark. App 199. In both of these cases the Court determined that the relationship of the decedent and their step-child(ren) did not rise to the level of in loco parentis and that those rulings should be applied to this case. This court disagrees and believes that this case can be distinguished from the ones cited. The daughters focus on the age that the sons where when they entered the life of the decedent and that the sons should have been young children for the in loco parentis status to attach. However, that is not the intent of the law as the Court reads it. If that were the intended interpretation, then the statute would not explicitly state "regardless of age" nor "at any time" during the life of the deceased.

3. The Court must also consider the totality of the circumstances. Evidence was presented that all four step-sons maintained a relationship with the decedent throughout their and the decedent's lives, even after the decedent and their mother divorced. The step-sons' biological father has been deceased for at least thirty-seven years and the decedent fulfilled the role of their father. There was evidence of continuous communication and some financial assistance from the boys to the decedent up to the day he died.

4. The Court's final consideration was that none of the beneficiaries are the decedent's biological children, and, but for the stipulation, the step-daughters and the granddaughter presented no evidence that they should be provided superior standing to benefit.

5. From the testimony of witnesses and other evidence before it, the Court believes the step-sons, John W. Tippit, Timothy L. Tippit, Steven [sic] C. Tippit, and Robert E. Tippit have met their burden to prove that the decedent stood in loco parentis to them.

The court's order proceeded to divide the net proceeds among all seven of the parties, with the appellants each receiving $16,333 and the Tippits each receiving $10,000.

## III. *Analysis*

Pursuant to Ark. Code. Ann. § 16-62-102(d) (Supp. 2023), beneficiaries in a wrongful-death action under this section are (1) the surviving spouse, children, father, mother, brothers, and sisters of the deceased person; (2) persons, regardless of age, standing in loco parentis to the deceased; and (3) *persons, regardless of age, to whom the deceased stood* in loco parentis *at any time during the life of the deceased person.*[6] The appellants argue that the court

---

[6]Before 2001, Ark. Code Ann. § 16-62-102(d)(3) stated that the beneficiaries of a wrongful-death action included "persons to whom the deceased stood in loco parentis." In 2000, the Arkansas Supreme Court decided *Babb v. Matlock*, 340 Ark. 263, 9 S.W.3d 508 (2000), strictly interpreting the statutory language and held that the relationship did not extend past the age of majority. In response, the legislature amended section 16-62-102(d)(3) to the current law.

erred in its interpretation of section 102(d)(3) in finding the existence of an *in loco parentis* relationship between the Tippits and Waymon. The court found that the use of the words "at any age" in subdivision (d)(3) was intended to expand the definition of *in loco parentis* to include relationships between a decedent and a person that begin when the person is "any age." The Tippits contend that the court correctly found they were beneficiaries under subdivision (d)(3) due to their extensive relationship with Waymon.

We review issues of statutory interpretation de novo. While we are not bound by the circuit court's interpretation, we will accept the circuit court's interpretation if it was not made in error. *Cockrell v. Union Planters Bank*, 359 Ark. 8, 194 S.W.3d 178 (2004). The basic rule of statutory construction is to give effect to the intent of the legislature. *Calaway v. Practice Mgmt. Servs., Inc.*, 2010 Ark. 432. We will determine the legislative intent by the language of the statute, specifically whether the language used is plain and unambiguous. *Id.* In considering the meaning of a statute, we construe it just as it reads, giving the words their ordinary and usually accepted meaning in common language. *Id.* "[N]o word [in the statute] is left void, superfluous, or insignificant, and we give meaning and effect to every word in the statute, if possible." *Id.* at 3. If the language of a statute is clear and unambiguous and conveys a clear and definite meaning, it is unnecessary to resort to the rules of statutory interpretation. *Brown v. State*, 375 Ark. 499, 292 S.W.3d 288 (2009).

This court was asked to address the statutory interpretation of subdivision (d)(3) in *Zulpo v. Blann*, 2013 Ark. App. 750, but we declined. The circuit court in *Zulpo* did not find that an *in loco parentis* relationship had existed at *any time*, which we affirmed. *Id.* Because the circuit court never found that an *in loco parentis* relationship existed, we held that "it is unnecessary for us to consider appellant's argument that the 2001 amendment allows a person to act *in loco parentis* to another person who is an adult." *Id.* at 4.

That issue is now before us. The circuit court found an *in loco parentis* relationship between the Tippits and Waymon pursuant to Ark. Code Ann. § 16-62-102(d)(3). Specifically, under this statute, the court interpretated the term "*regardless of age*" to mean that an *in loco parentis* relationship can be established with a decedent at any age. The court declined to interpret the statute to mean that the Tippits had to be minors when the relationship with Waymon was established.

The appellants argue that the Tippits had a father in Missouri whom they lived with and who provided for the boys most of their childhood; thus, the *in loco parentis* relationship could not attach. For us to interpret the statute as the appellants argue, we would have to find that the legislature intended to limit the *in loco parentis* relationship to those individuals who, as minors, formed a relationship with another individual, and the words "regardless of age" would be rendered meaningless. By applying the plain meaning of the term "regardless of age" to the case before us, we decline to adopt the appellants' interpretation of the statute. We will not read into a statute language that was not included by the legislature. *Ark. Dep't of Corr. v. Shults*, 2018 Ark. 94, 541 S.W.3d 410. We hold that the circuit court did not err

10

when it interpreted the term "regardless of age" to mean that the Tippits could develop an *in loco parentis* relationship with Waymon beginning in their teenage years and into their adulthood.

We have previously defined *in loco parentis* as "in place of a parent; instead of a parent; charged factitiously with a parent's rights, duties, and responsibilities." *Standridge v. Standridge*, 304 Ark. 364, 372, 803 S.W.2d 496, 500 (1991) (quoting *Black's Law Dictionary* (5th ed. 1979)). This relationship involves more than a duty to aid and assist and more than a feeling of kindness, affection, or generosity. *Daniel v. Spivey*, 2012 Ark. 39, at 6, 386 S.W.3d 424, 428. We have held, "[I]n determining whether a nonparent stands in loco parentis, courts consider the totality of the circumstances and do not lightly infer the intent of the person sought to be standing in loco parentis." *Williams v. Davis*, 2021 Ark. App. 199, at 8, 625 S.W.3d 243, 248. The focus should be on what, if any, bond has formed between the child and the nonparent. *Bethany v. Jones*, 2011 Ark. 67, at 10, 378 S.W.3d 731, 737.

In deciding whether the Tippits were qualified beneficiaries under the wrongful-death statute, we must determine whether the Tippits and Waymon did, in fact, have an *in loco parentis* relationship considering the totality of the circumstances given their fifty-three-year relationship. The appellants cite *Zulpo*, *supra*, in favor of finding that an *in loco parentis* relationship did not exist between the Tippits and Waymon. We find this case distinguishable. The appellants in *Zulpo*, who were the stepchildren of Blann, testified that Blann was like a father to them and treated them as if they were his sons. However, they lived with their father, and he supported them. They testified that after they became adults,

11

Blann loaned them money and gave one of them a watch. The appellants also testified that they visited him frequently until his death. In contrast, the Tippits' relationship with Waymon began when they were teenagers in 1970 when Waymon moved in with their mother, Lois. Waymon conducted himself as a father figure in their lives until his death in 2023. The testimony included a recount of fifty-three years of history between each of the Tippits and Waymon. The evidence in this case clearly reflected an emotional bond rising to the level of a parental relationship. Waymon assumed a parental role—by disciplining them, supporting them, teaching them how to drive, teaching them various trades, and enjoying hobbies and activities like hunting and fishing together. As they grew older, they testified as to how they helped support Waymon—financially, emotionally and physically. Eddie testified that Waymon was the only grandfather his children ever knew, and Waymon spent the holidays with them. Waymon and the Tippits continued to remain active in each other's lives until Waymon's death. Given those factors and in light of the totality of the circumstances, we hold that the circuit court did not clearly err in determining that an *in loco parentis* relationship existed between Waymon and the Tippits.

## IV. *Cross-Appeal*

The Tippits cross-appeal on the basis that the appellants were unjustly awarded a portion of the wrongful-death proceeds because they failed to put on any proof or testimony with respect to their damages (loss). We will not consider issues raised for the first time on appeal. *Valentine v. White Cnty. Med. Ctr.*, 2020 Ark. App. 565, 615 S.W.3d 729. The Tippits failed to raise this issue at the trial; accordingly, it is not preserved.

12

Affirmed on direct appeal; affirmed on cross-appeal.

HARRISON and MURPHY, JJ., agree.

*Garland L. Watlington*, for appellants/cross-appellees.

*Wells & Wells, PLLC*, by: *Phillip Wells*; and *Brian G. Brooks, Attorney at Law, PLLC*, by: *Brian G. Brooks*, for appellees/cross-appellants.