Jane CHITWOOD *v.* Gordon CHITWOOD

CA 04-996                                                211 S.W.3d 547

Court of Appeals of Arkansas
Opinion delivered June 29, 2005

130

*Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C.*, by: *Curtis E. Hogue*, for appellant.

*Matthews, Campbell, Rhoads, McClure, Thompson & Fryauf, P.A.*, by: *David R. Matthews* and *Sandra L. Waddoups*, for appellee.

DAVID M. GLOVER, Judge. Appellant, Jane Chitwood, and appellee, Gordon Chitwood, were divorced by decree entered on October 21, 1993. They had two children, A.C. and K.C. Appellant subsequently moved with the children to Tulsa, Oklahoma, and visitation problems ensued. In a February 19, 1999 letter to appellant, appellee wrote: "I give up. As per your request, my parental rights are hereby surrendered and child support payments are terminated. You and the children will never see or hear from me again." For the next five years, appellee did not see the children nor pay support after that date until the current proceedings were initiated. On April 21, 2003, appellant filed a motion for contempt and complaint for money damages in which she sought to have appellee held in contempt and ordered to pay back child support. Appellee counter-petitioned to modify the support order. At the hearing, it was stipulated that the amount of accrued arrearage was $189,226 and that the amount of child support to be paid by appellee to appellant, beginning June 1, 2004, was $4,512 a month. Following the hearing on the matter the trial court found that appellant was prohibited by the doctrine of equitable estoppel from seeking to collect child-support arrearages or to enforce any child-support judgment that had accrued through the date of May 25, 2004. For her sole point of appeal, appellant contends that the trial court erred in finding that appellee proved the elements of equitable estoppel and thus erred in barring her from recovering the child-support arrearage on that basis. We disagree and affirm.

At the hearing in this matter, appellant testified that appellee paid his child support in a timely fashion until January 1999. She stated that on or about February 24, 1999, she received a letter

dated February 19, 1999, from appellee, which stated that he was surrendering his parental rights and that child-support payments would be terminated per her request, and further that neither she nor the children would ever see or hear from him again. She explained that she sent the letter to her attorney and that, in return, she received from her attorney "some research regarding Arkansas law as it pertained to voluntary termination of parental rights and release of child-support obligations." She testified that based upon the legal research that she received, she believed at the time that appellee owed a continuing obligation of child support and that he continued to be entitled to visitation, but that she never told him either of these things. She stated that she changed her tax returns to claim both children as dependents after the child-support payments ceased.

Appellant testified that she did not file a contempt action for child support in 1999 because her children were "emotionally drained" and she felt as if she had to choose between money and her children's mental well-being. She stated that she borrowed money from the bank to make ends meet.

Appellant acknowledged that on August 24, 2001, she sent a letter to appellee's parents, and she described her letter as stating that she did not think appellee was serious and that he could show up at any time to visit the children. She told the grandparents that the children could visit with them overnight only if there would be no contact with appellee. She stated that she filed the contempt action in April 2003 primarily for financial reasons to recover child support, but also because the children were older and mature enough to handle a relationship with their father. She stated that she had never refused appellee's visitation.

Appellant testified that there was a contempt action against her in 1997 and that it was settled by her agreeing not to prevent visitation with appellee and to use her best efforts to facilitate visitation. She stated that she allowed appellee overnight visitation with the children until an incident on December 18, 1998, which occurred in Tulsa, Oklahoma. She explained that appellee came to Tulsa to exercise his visitation for Christmas and that she would not allow the children to go with him. She denied that she discussed with appellee at that time "doing away with visitation and child support." She acknowledged, however, that during a prior incident in 1997, when appellee was angry because the children's suitcases were not ready when he came to get them, that she said, "Why don't you just give them up?" She testified that

when she received appellee's February 1999 letter that began, "Per your request," she "did not have any idea what he was talking about." She denied discussing with her attorney, prior to receiving appellee's letter, whether she and appellee could make a deal whereby appellee agreed not to exercise visitation in exchange for not paying child support.

Appellant stated that both children had problems seeing their father. She said that A.C. had panic attacks and that visiting with his dad made his anxiety worse, "although he had anxiety as a little boy and had continued to have anxiety." She explained that she had just bought a new house in 1999 and that she was able to make house payments by borrowing money at first and that she then inherited around $350,000. She stated that once most of the inheritance money was depleted, she initiated the action to recover the outstanding child support from appellee. She stated that by the time the action was filed, she did not have enough money to take care of the children. She acknowledged that when that fact was communicated to appellee, he began paying child support again. She also acknowledged that in the opinion letter that she received in 1999 from her attorney, one of the available options that was noted was for appellee "to pay no child support and in return, exercise no visitation."

With respect to the events of December 1998, appellant testified that around the first of December 1998, she received a letter from appellee in which he stated that he would exercise his Christmas visitation and that he would pick up the children on December 18 for eight days of visitation. She stated that prior to that time, appellee had not exercised overnight visitation with the children for the previous seventeen months and that he had only exercised daytime visitation on limited occasions. She stated that she pleaded with him not to take the children for eight days and nights, but that he told her he would be there to pick them up on Friday for eight days of visitation. She stated that on Friday, December 18, she was driving up to the house with the children in the car when she noticed that appellee was backing out of the driveway. She stated that she continued to drive to a friend's house and that she and the children went into the friend's house. She explained that appellee followed them and came to the front door of the house. She stated that he was not allowed in and that she did deny him visitation. She stated that he filed a contempt action against her the following Monday.

Appellee also testified at the hearing in this matter. He explained that following his divorce from appellant, he was never able to exercise visitation with the children without there being some controversy. He stated that those controversies caused him to return to court on occasions between 1994 and 1999. He explained that there was a period of approximately seventeen months prior to December 1998 when he did not exercise overnight visitation with the children. He testified that many times he would attempt to exercise visitation, but for different reasons would be unsuccessful. He stated that sometimes he would drive to Oklahoma and there would be no one at home, and that at other times, appellant would tell him that the children were not feeling well and did not want to come for a visit. He explained that his son, A.C., was being seen by a psychologist for his anxiety and that the doctor had asked that visitation cease for a period until the doctor completed her sessions with A.C. Appellee stated that he was not informed by appellant until December 1998 that the sessions had ended in May 1998, accounting for the approximate seventeen-month period where he exercised limited visitation.

Appellee testified that appellant called him after she received his letter concerning Christmas 1998 visitation and that she wanted to modify visitation from eight days and nights to one day and one night. He said that he told her such a modified arrangement was not acceptable and that she became angry. He testified that she asked him, "Why don't you give up your visitation, stop paying child support, and leave us alone," and then she hung up.

Appellee explained that he arrived at appellant's house on December 18 at five minutes before six o'clock in the evening. He stated that he sat in his car until 11:00 p.m. when he decided that he would leave to use the bathroom, get something to eat, and then come back. He stated that as he was pulling out of the driveway, he saw appellant and the children drive by the house. He said that he followed her car to a friend's house, which was about three miles away. He explained that he went to the front door and told her that he was there to exercise his visitation, that she told him he was not taking the children, and that there was nothing he could do about it. He stated that he called the police, that they arrived, and that they told him because his papers were from Arkansas, there was nothing they could do. He said that he drove home and had a contempt action filed.

Appellee explained that the contents of the February 17, 1999 order, which was entered by a special judge further hamper-

ing his visitation, "was the straw that broke the camel's back." He stated that he was totally frustrated; that he saw no hope of having a meaningful relationship with his children; and that he wrote the February 1999 letter, beginning "Per your request," in reference to appellant's December 1998 phone call. He testified that he thought the February 1999 letter represented a binding agreement and that he had no contact with appellant or the children after that date until this action for child support was initiated. He said that he did not know that child-support arrearage was accruing. He explained that he believed that he was set up to take a fall; that appellee knew everything that was going on; that she just wanted "to play me out until she ran out of her inheritance and then come and hit me for all this money"; and that there was no way that he could go back and get that time with his children.

Appellee testified that he has another daughter from an earlier marriage and that he has a good relationship with her mother. He stated that he has always exercised visitation with her and that he has paid and continues to pay child support and college expenses, even though it is no longer required. He also explained that he continued to provide insurance coverage for A.C. and K.C. after the February 19, 1999 letter because he did not trust appellant to continue to work. He stated that he was not concerned about appellant's and the children's monetary condition because he knew that appellant had "inherited an extremely large sum of money from her father."

Appellant's former attorney testified by deposition, after appellant waived the attorney-client privilege, that he received a letter from appellee's attorney dated March 22, 1999, which indicated that appellee and appellant had agreed that appellant would no longer have visitation and would no longer pay child support. He stated that he forwarded the letter to appellant and had conversations with her about the substance of the letter. He explained that an attorney, who worked for him at the time, prepared a research memo concerning whether appellee could relinquish his parental rights and obligations in that fashion and that the attorney drafted an opinion letter to appellant on the same subject. The research memorandum was dated May 21, 1999, and he explained that it was his belief that the opinion letter that was sent to appellant would have followed preparation of the memorandum. He further testified, however, that he recalled discussing with appellant the notion of swapping visitation for money before appellee's February 19, 1999 letter was received by appellant.

The opinion letter that the attorney wrote to appellant was introduced as an exhibit. It provided in pertinent part:

> As we discussed during our telephone conference on Friday, it is my opinion, after reviewing Arkansas law, that an agreement to terminate parental rights in exchange for a waiver of child support would not be enforced by an Arkansas court if the agreement was challenged at a later time. In fact, it is my opinion the agreement would be voided, i.e., held never to have existed. If the agreement is not enforced, your attorney would certainly assert that a judgment for past-due child support should be entered against Dr. Chitwood. However, there is no guarantee that a court would award you the past-due support as I suspect Dr. Chitwood would raise equitable defenses in hopes the court would not enter a judgment against him.
>
> . . . .
>
> The other option, as you noted, is that you can do nothing. If Dr. Chitwood is not exercising his visitation, that is his problem so long as you are not denying it. Child support payments that he does not make become individual judgments once he does not make the payments. Therefore, you can collect them by garnishment or by obtaining an income withholding order.

A trial court's ruling on child-support issues is reviewed *de novo* by this court, and the trial court's findings are not disturbed unless they are clearly against the preponderance of the evidence. *State v. Burger*, 80 Ark. App. 119, 92 S.W.3d 64 (2002). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed. *Rigsby v. Rigsby*, 356 Ark. 311, 149 S.W.3d 318 (2004). We give due deference to the superior position of the trial court to view and judge the credibility of the witnesses. *Id.*

Once a child-support payment falls due, it becomes vested and a debt due the payee. *Office of Child Support Enforcement v. King*, 81 Ark. App. 190, 100 S.W.3d 95 (2003). However, enforcement of child-support judgments are treated the same as enforcement of other judgments, and a child-support judgment is subject to the equitable defenses that apply to all other judgments. *Id.* If the obligor presents to the court or administrative authority a basis for laches or an equitable-estoppel defense, there may be

circumstances under which the court or administrative authority will decline to permit enforcement of the child-support judgment. *Id.*

■ The elements of equitable estoppel are (1) the party to be estopped must know the facts; (2) the party must intend that its conduct shall be acted on or must so act that the party asserting estoppel had a right to believe the other party so intended; (3) the party asserting estoppel must be ignorant of the facts; and (4) the party asserting estoppel must rely on the other party's conduct to his detriment. *Burger, supra.*

The trial court specifically noted in its order that the credibility of the witnesses was the crucial factor in deciding this case. The court made the following pertinent findings: 1) that appellant initiated the conversations concerning the agreement that appellee would surrender his parental rights and terminate his child-support payments; 2) that appellant was aware that such an agreement was unenforceable and void as against public policy in Arkansas, but that she intentionally, by her words and especially by her actions, induced appellee to give up his visitation privileges in exchange for her agreement not to seek child support; 3) that appellant had received legal advice on the consequences of her actions; 4) that she intended that her conduct be acted upon and that appellee believed that she so intended; 5) that appellee was ignorant of the facts; 6) that appellee relied upon appellant's conduct to his detriment. In announcing her decision from the bench, the trial judge further explained that appellee's detrimental reliance was not monetary, but rather that appellee "let go of five years [of visitation] that never gets made up, five years of time that is just gone, five years of time that nobody gets to recapture."

We find no clear error with respect to any of the trial court's findings. First, as noted by the trial court, credibility was a crucial factor in this case, and we give due deference to the trial court's credibility determinations. Second, we hold that the elements of estoppel were established.

### (1) Appellant knew the facts

■ Appellant knew that the "agreement" by which appellee gave up his parental rights and stopped making support payments was not enforceable and that the child-support obligations would continue to accrue. The deposition of appellant's attorney

disclosed that he believed he discussed with appellant the notion of swapping visitation for money *before* the February 19, 1999 letter from appellee, and that he distinctly remembered discussing the February 19, 1999 letter with appellant concerning its validity. Moreover, the opinion letter that was subsequently prepared for appellant explained that under Arkansas law, an agreement to terminate parental rights in exchange for a waiver of child support would not be enforced by the courts and that a judgment for past-due child support would presumably be entered, but cautioned that her ex-husband might raise equitable defenses.

*(2) The party must intend that its conduct shall be acted on or must so act that the party asserting estoppel had a right to believe the other party so intended*

■ The trial court clearly believed appellee's testimony that appellant initiated the conversations by asking appellee to give up his visitation, to stop paying child support, and to leave them alone. The trial court also recognized that after receiving the February 19, 1999 letter from appellee and the opinion letter from her attorneys, appellant did not contact appellee about paying child support or about visitation, and, in fact, wrote to the paternal grandparents two years later, requiring assurances that appellee would not be allowed to visit the children if they went to visit the grandparents. Appellee had every right to believe that appellant intended for her conduct to have the result that it did.

*(3) The party asserting estoppel must be ignorant of the facts*

■ Appellee testified that it was his belief that the agreement relinquishing his parental rights and stopping child-support payments was enforceable. His conduct supported that testimony in that he did not see his children nor pay support after the date of the letter until these proceedings began. Moreover, the trial court clearly credited appellee's testimony that he was not informed by his attorney about the invalidity of the agreement. Consequently, appellee was not factually aware that child support was legally accruing, and he was obviously not aware that appellant had specifically sought legal opinions regarding the validity of the agreement.

*(4) The party asserting estoppel must rely on the other party's conduct to his detriment*

■ Finally, as noted by the trial court, the detriment in this case is not monetary. Rather, it is the amount of time that appellee went without seeing his children, which is time that can never be regained.

In *Arkansas Department of Human Services v. Cameron*, 36 Ark. App. 105, 818 S.W.2d 591 (1991), which has been overruled to a limited extent under circumstances not applicable in this case,[1] the appellee ex-husband, Richard Cameron, signed a consent to adoption, giving his consent for appellant's new husband to adopt appellee's child. Cameron testified that he stopped paying child support when he signed the adoption papers because he believed that signing the consent for adoption had the effect of terminating his parental rights and obligations. He also stopped visitation with his child. However, the adoption was never completed, and he was never informed of that fact. The trial court found that the mother was "'estopped because of her actions into leading this man into thinking there was or was going to be an adoption . . . from collecting the arrearages and support.'" 36 Ark. App. at 107, 818 S.W.2d at 593. Our court affirmed:

> Appellee testified that [the mother] contacted him concerning the adoption and wanted him to sign the consent. He said it was his understanding that when he signed he did away with his legal rights and his obligation to pay child support, and because of this belief, he no longer sought to exercise his visitation rights. We believe these circumstances are sufficient to establish the elements of estoppel, and we cannot say that the chancellor's finding is clearly erroneous.

36 Ark. App. at 109, 818 S.W.2d at 593. The situation presented in *Cameron, supra*, is similar to that presented here.

■ ■ In short, the trial court's findings of fact in the instant case are not clearly erroneous. Those facts satisfy the elements of equitable estoppel. The case law of this state holds that

---

[1] *See Arkansas Dep't of Human Servs. v. Robinson*, 311 Ark. 133, 842 S.W.2d 47 (1992) (*Robinson* explains that a court may not do indirectly that which it is directly prohibited from doing, and that under RURESA, the Arkansas court could not directly determine visitation nor could it be raised as a defense; therefore, supreme court held that the trial court could not indirectly determine visitation by making payment of child support dependent upon visitation).

the enforcement of child-support judgments are treated the same as enforcement of other judgments, and that a child-support judgment is subject to the equitable defenses that apply to all other judgments, including equitable estoppel. Our supreme court has defined equitable estoppel as "a judicial remedy by which a party may be precluded by its own act or omission from asserting a right to which it otherwise would have been entitled, or pleading or proving an otherwise important fact." *R.N. v. J.M.*, 347 Ark. 203, 216, 61 S.W.3d 149, 157 (2001). Appellant had a large source of money available to her during the period that she was not receiving child support from appellee, so the children did not suffer under these circumstances. Moreover, when these proceedings began and appellee learned that the money had dissipated, he immediately began paying child support again. The trial court, which was in the best position to evaluate this situation, invoked the judicial remedy of equitable estoppel, and we find no error in its having done so under the circumstances of this case.

Affirmed.

PITTMAN, C.J., ROBBINS, VAUGHT, and CRABTREE, JJ., agree.

BIRD, GRIFFEN, NEAL, and BAKER, JJ., dissent.

OLLY NEAL, Judge, dissenting. Because I am of the opinion that appellee failed to satisfy the third and fourth elements necessary to avail himself of the equitable estoppel defense, I respectfully dissent. Specifically, appellee has proven neither that he was ignorant of the facts nor that he relied on appellant's conduct to his detriment.

The majority has determined that the following made appellee ignorant of the fact that child support was legally accruing: (1) his conduct of neither seeing his children nor paying support after the date of the letter, (2) his testimony that it was his belief that the agreement relinquishing his parental rights and stopping child-support payments was enforceable, and (3) the trial court's credence to appellee's testimony that he was not informed by his attorney about the invalidity of the agreement. I do not agree.

A parent has a legal and moral duty to support his minor children, regardless of the existence of a support order. *See Ford v. Ford*, 347 Ark. 485, 65 S.W.3d 432 (2002); *Fonken v. Fonken*, 334 Ark. 637, 976 S.W.2d 952 (1998). Neither the dissolution of the

marriage tie, nor awarding custody of the children, either permanently or temporarily, to the mother, relieves the father of his obligation to support them. *Id.* Here, appellant's actions in telling appellee to "just give [the kids] up," and appellee's reliance thereupon, are insufficient to relieve him of his legal and moral obligation to his minor children. Even when the support obligation may be affected by contract, the duty cannot be bartered away permanently to the detriment of the child. *See Fonken v. Fonken*, *supra*.

Appellee knew that the court had ordered him to pay $6095.92 in support each month for his two children. Thus, he was not ignorant of the facts in this instance. *See State v. Burger*, 80 Ark. App. 119, 92 S.W.3d 64 (2002) (equitable estoppel was not applicable in part because appellee was not ignorant of the fact that he had not paid court-ordered child support). Furthermore, notwithstanding the existence of an "agreement" between him and appellant, appellee continued to have a moral duty to provide support for his children. It is clear from the facts of this case that appellee recognized that duty. Appellee continues to provide child support for his older daughter from a previous marriage, "as well as college living expenses and all other expenses," regardless of the fact that she has reached the age of majority and there no longer exists an order. His recognition is further evidenced by the continued insurance coverage he provides for A.C. and K.C. and by appellant's testimony that appellee sent a child-support payment in January of 2004 in the amount of $2950. The submission of this payment was, notably, after appellee wrote the February 1999 letter in which he agreed to "surrender" his parental rights and "terminate" his child support payments.

Appellee has also failed to show that he relied on appellant's conduct to his detriment. The trial court and this court recognize that the detriment in this case is not monetary but is the amount of time that appellee has lost with his children, which is time that can never be regained. I can agree with this notion to some extent; however, I cannot find where appellee regularly exercised his visitation prior to the February 1999 "agreement." Appellee acknowledged that, for a period of approximately seventeen months prior to December of 1998, before writing the letter, he did not regularly exercise his visitation with the children. Many times, he explained, he would drive the four-hour round trip to

Tulsa, only to be denied visitation for one reason or another.[1] Notwithstanding this, however, appellee obviously knew that he could seek court intervention because he had previously filed a contempt proceeding against appellant for her refusal to allow him proper visitation with the children for Christmas in 1998. Regardless, payment of appellee's child support was not dependent upon his visitation with the children. *See State v. Robinson*, 311 Ark. 133, 842 S.W.2d 47 (1992). Appellee could have availed himself of all the judicial processes to enforce his visitation rights.

Additionally, as a matter of public policy, it is my contention that equitable estoppel should not apply with the same force in matters such as these where you have a third party (the minor child) involved and for whose benefit the child support payments inure. An order of support is for the benefit of children, even though it is directed to be paid to the mother or other custodian. *Office of Child Support Enforcement v. Harris*, 87 Ark. App. 59, 185 S.W.3d 120 (2004) (citing *Miller v. Miller*, 929 S.W.2d 202 (Ky. Ct. App. 1996)). The courts have said that once a child-support payment falls due, it becomes vested and a debt due to the payee. *State v. Burger, supra*. It has long been the law in Arkansas that the interests of a minor cannot be compromised by a guardian without approval by the court. *Davis v. Office of Child Support Enforcement*, 322 Ark. 352, 908 S.W.2d 649 (1995). Our supreme court has further provided that:

> It is not sufficient that a court be made aware of a compromise agreement and that it is agreeable to the guardian; rather, the court must make a judicial act of investigation into the merits of the compromise and into its benefits to the minor. Any judgment by a court that compromises a minor's interest without the requisite investigation is void on its face.

*Id.* at 355-56, 908 S.W.2d at 651-52. Although equitable estoppel has been used in other instances such as this where the parties reach an

---

[1] In determining that appellee has not proven the elements of equitable estoppel, I in no way mean to endorse the tactics used by the appellant. She obviously thwarted appellee's visitation on many occasions, and she was not entirely innocent in this situation. She knew that the "agreement" was unenforceable; nevertheless, she chose to forego seeking child support until such time that she felt the children were ready to exercise visitation with their father. I do not condone such conduct. Regardless of this, appellee did not meet his burden of proving the third and fourth elements of equitable estoppel.

agreement to cease support, *see Truman v. Truman*, 256 Neb. 628, 591 N.W.2d 81 (1999) (custodial parent agreed that neither she nor the non-custodial parent would be obligated to pay child support to each other because both had custody of one child); *In re Marriage of Harms v. Harms*, 174 Wis. 2d 780, 498 N.W.2d 229 (1993) (where custodial parent removed the children in her custody from the state where the father resided, advised him in writing that she no longer expected him to pay child support, and took no legal action to enforce the original child-support obligation for a period of seven years, she was estopped from collecting accrued child support), such extrajudicial agreements of the parties regarding termination of child-support obligations are enforceable under the doctrine of equitable estoppel where the children are not adversely affected. *See State v. Stephen Leo S.*, 198 W. Va. 234, 479 S.E.2d 895 (1996) (holding that extrajudicial agreement of parties regarding termination of child support obligations was enforceable under doctrine of equitable estoppel where welfare of children not adversely affected); *McNattin v. McNattin*, 450 N.W.2d 169 (Minn. App. 1990) (holding that mother's extrajudicial agreement not to seek child support in exchange for father's agreement to relinquish custody of child to her not binding upon the court but was enforceable under doctrine of equitable estoppel).

Here, the evidence indicates that the children may have been adversely affected. Unlike the situation in *State v. Stephen Leo S.*, *supra*, where the children received financial support from their step-father, Thomas Crouse, who contracted under an express agreement that such support was provided on behalf of the non-custodial father,[2] and where the record did not disclose that the children were ever deprived of their financial needs due to any default by Thomas Crouse in meeting such obligation, the appellant in this case underwent some financial difficulties. Appellant testified that:

---

[2] In *State v. Stephen Leo S.*, *supra*, the custodial parent decided to marry Thomas Crouse while that same year her ex-husband and the non-custodial parent decided to marry Crouse's ex-wife, Sharon Crouse. Thomas and Sharon Crouse had three children from their marriage. Prior to the remarriage of the four individuals, they each executed an agreement that purported to absolve the non-custodial father of child support payments to the custodial parent. Under the agreement, Thomas Crouse was obligated to provide for the support of the non-custodial father's two children. In turn, the non-custodial father agreed to provide for the support of Thomas's three children.

Once a majority of the inheritance money was depleted, I initiated the action to recover the outstanding child support. By the time the action was filed, I did not have enough money to take care of the children.

I further note that the children have not been named as parties in this matter. To the extent that the two children of the parties wish to assert any right they may have to past child support obligations by the appellee, they are presumptively capable of bringing an independent action against their father. Our law provides that, once a child turns eighteen, he or she may file a petition to collect unpaid support from the non-supporting parent. *See* Ark. Code Ann. § 9-14-105(c) (Repl. 2002).

I am authorized to state that Judges Bird, Griffen, and Baker join in this dissent.