

Cite as 2015 Ark. App. 6

# ARKANSAS COURT OF APPEALS

DIVISION III
**No.** CV-14-512

|  |  |
|---|---|
| DIANA MCKENZIE<br>APPELLANT<br><br>V.<br><br>DIANA STOCKTON MOORE<br>APPELLEE | Opinion Delivered January 14, 2015<br><br>APPEAL FROM THE SALINE COUNTY CIRCUIT COURT [NO. 63DR-13-1248]<br><br>HONORABLE ROBERT HERZFELD, JUDGE<br><br>AFFIRMED |

## BRANDON J. HARRISON, Judge

Diana McKenzie appeals the Saline County Circuit Court order granting visitation rights to her daughter's stepmother, Diana Moore. McKenzie argues that the circuit court erred in finding that Moore stood in loco parentis to her daughter and awarding visitation. We affirm.

In November 2013, Moore filed a motion for visitation in the Saline County Circuit Court, explaining that she was M.M.'s stepmother and had been married to M.M.'s father until he passed away in July 2013.[1] Moore asserted that she stood in loco parentis to the child during the marriage and requested that a visitation schedule be set to ensure continuing contact with the child.

---

[1] Moore was also the stepmother of V.M., M.M.'s sister, but V.M. turned eighteen during this case and was not subject to the visitation order.

SLIP OPINION

At a hearing held in March 2014, Moore testified that she first became involved in M.M.'s life when she was six years old and that M.M. was now five days away from turning thirteen. Moore said that when her husband passed away M.M. lived with them and that she (Moore) still lived in that home. Moore explained that she and Ron Moore, M.M.'s father, had dated for four and a half years before they married and that she was actively involved in M.M.'s life during that time. Ron was a pilot and traveled frequently out of town, and there were many times that she kept M.M. and saw to her day-to-day needs, including school activities, piano practice, doctor's appointments, clothes-shopping, and soccer practice.

Beginning in August 2008, Ron had sole custody of M.M., and Moore continued to take care of M.M. when Ron was away. Moore also testified that she was the trustee of a trust that was established by her late husband for his daughters' benefit. Moore explained that her home with their father is the place that the girls knew as home, and that their rooms, possessions, and pets were still there. Moore stated that it was in M.M.'s best interest to continue to have a connection with her and the house that she (M.M.) shared with her father.

On cross-examination, she testified that she took her role as trustee very seriously, that she and Ron had many discussions about the girls' college education, and that she bases any expenditures out of the trust "upon the very best judgment that I can use as a person and as a parent." She also testified that she had given the girls pocket money outside of the trust. She agreed that she regularly had phone or text conversations with M.M. but wanted more contact. Moore felt that McKenzie interfered with that contact,

and that she and McKenzie do not really get along. But she agreed that she "absolutely" would not have a problem working with McKenzie if the court awarded her visitation.

Upon questioning by the court, Moore stated that she had been a parent to the girls; that she kept them on average one or two nights a month while she and Ron were dating; that after they were married, she acted as a parent by preparing meals and sitting down with them as a family; and that she and the children traveled together to meet their father in Florida and New York City. She explained that she and M.M. did homework together at night and that she enrolled M.M. in school and got all her school supplies. She said that she did not make any decisions about the girls' schooling without their father's involvement, but she did attend parent-teacher conferences when Ron was not there. She also said that she took the girls to the doctor and had authority to make medical decisions for them.

M.M. testified that she wanted to visit Moore because "she's a big part of my life." She testified that Moore had taken care of her by taking her to sport activities, the dentist, to get hair cuts, and shopping for clothes. Moore had also attended her school events. M.M. described her relationship with Moore as "close" and said that she would like to see her at least every other weekend. Prompted by the court's questioning, M.M. stated of Moore that "She's special just because I know she loves me. And I know there are other people that love me, too, but it's just special." M.M. said that she saw Moore as more than a stepparent and explained that "I know that she really does care for me and I know she has intentions for me and I know that she'll help me and she'll support me through as I need." She agreed that she considered Moore as family and a parent figure.

McKenzie testified that she had "mixed" feelings about her daughter spending more time with Moore. She expressed concern that Moore would not communicate with her but agreed that she and Moore could have an amicable relationship. She agreed that she and Moore had both testified that they were willing to work together for M.M.'s best interest. She also acknowledged that a part of her thought it was a good idea for M.M. to have a relationship with Moore. She agreed that she "really [didn't] have an issue with them seeing Ms. Moore."

In its oral ruling, the court found that Moore stood in loco parentis to M.M. and should be granted visitation. The court mentioned several factors that contributed to its decision, including responsibility for medical and educational needs, overnight care, traveling together, and the length of time Moore and M.M. have had a relationship. The court based its decision in large part on M.M.'s testimony, which it found to be credible. The court awarded visitation in the amount of one weekend per month; two weeks per year, which may be divided as agreed to by the parties; and Father's Day. A written order memorializing these findings was entered, and McKenzie timely appealed.

We review domestic-relations cases de novo on the record, but will not reverse a trial court's findings of fact unless they are clearly erroneous. *Robinson v. Ford-Robinson*, 362 Ark. 232, 208 S.W.3d 140 (2004). A finding of fact by a circuit court is clearly erroneous when, despite supporting evidence in the record, the appellate court viewing all of the evidence is left with a definite and firm conviction that a mistake has been committed. *Stills v. Stills*, 2010 Ark. 132, 361 S.W.3d 823. We give due deference to the superior position of the circuit court to view and judge the credibility of the witnesses.

*Hunt v. Perry*, 357 Ark. 224, 162 S.W.3d 891 (2004). This deference to the circuit court is even greater in cases involving child custody or visitation, as a heavier burden is placed on the circuit court to utilize to the fullest extent its powers of perception in evaluating the witnesses, their testimony, and the best interest of the children. *Alphin v. Alphin*, 364 Ark. 332, 219 S.W.3d 160 (2005).

Our supreme court has explained the doctrine of in loco parentis:

> The Latin phrase, "in loco parentis," literally translated, means "in the place of a parent." *Simms v. United States*, 867 A.2d 200 (D.C. 2005). This court has defined in loco parentis as "in place of a parent; instead of a parent; charged factitiously with a parent's rights, duties, and responsibilities." *Standridge v. Standridge*, 304 Ark. 364, 372, 803 S.W.2d 496, 500 (1991). A person who stands in loco parentis to a child puts himself or herself in the situation of a lawful parent by assuming the obligations incident to the parental relation without going through the formalities necessary to a legal adoption. *Babb v. Matlock*, 340 Ark. 263, 9 S.W.3d 508 (2000). This relationship involves more than a duty to aid and assist, and more than a feeling of kindness, affection, or generosity. *Simms, supra*.
>
> One's mere status as a stepparent does not support a finding of in loco parentis. *Stair v. Phillips*, 315 Ark. 429, 867 S.W.2d 453 (1993). "Something more must be shown to qualify as standing in loco parentis." *Id.* at 535, 867 S.W.2d at 456. In loco parentis refers to a person who has fully put himself in the situation of a lawful parent by assuming all the obligations incident to the parental relationship and who actually discharges those obligations. *Rutkowski v. Wasko*, 286 A.D. 327, 143 N.Y.S.2d 1 (N.Y. App. Div. 1955). A stepparent who furnishes necessities for a minor child of his or her spouse and who exercises some control over the child does not, by those acts alone, establish a parental relationship. *Id.* In making a determination as to whether a nonparent stands in loco parentis, courts consider the totality of the circumstances and do not lightly infer the intent of the person seeking to be considered as standing in loco parentis. *Smith v. Smith*, 922 So.2d 94 (Ala. 2005). While the length of time a person spends with a child is not determinative, it is a significant factor in considering whether that person intended to assume parental obligations or has performed parental duties. *Id.*

*Daniel v. Spivey*, 2012 Ark. 39, at 6–7, 386 S.W.3d 424, 438.

SLIP OPINION

McKenzie argues that Moore has a caring relationship with M.M. but does not stand in loco parentis. She contends that this case aligns more closely with cases in which the appellate court held that no in loco parentis relationship existed, specifically citing *Daniel, supra*; *Standridge v. Standridge*, 304 Ark. 364, 803 S.W.2d 496 (1991); and *Walchli v. Morris*, 2011 Ark. App. 170, 382 S.W.3d 683. In *Daniel*, our supreme court reversed a finding of in loco parentis, stating that while the stepfather had "occasionally tended to [the child's] needs, provided necessities, babysat, and attended school programs . . . the sum of these facts demonstrates that appellee assumed the role of a caring stepparent, but they fall well short of establishing that appellee embraced the rights, duties, and responsibilities of a parent." 2012 Ark. 39, at 8–9, 386 S.W.3d 424, 429. In *Standridge*, a probate case, the supreme court held that there was no evidence that the decedent, Standridge, had formed the intent to assume the duties and benefits of becoming a parent to his stepson. And in *Walchli*, this court explained that, while a grandmother had been actively involved and helped watch her grandson while his father was at work, there was no evidence that the father intended the grandmother to do so as if she were another parent.

McKenzie argues that, like the cases above, the majority of Moore's relationship with M.M. was in the role of babysitter, Moore was only married to Ron and lived in the same household as M.M. for thirteen months, and Moore was "just a 'caring stepparent.'" McKenzie acknowledges that Moore "had many duties and responsibilities such as handling the trust he made for his children as well as their basic education, extracurricular, and medical care needs," but McKenzie claims that "there is no mention in the record

that the father thought of Ms. Moore as a co-parent with equal decision-making authority, or parental 'rights,' that he and the mother had as parents."

McKenzie also asserts that the court erred when it "over relied" on M.M.'s testimony. Here she cites *Daniel*, *supra*, and *Zulpo v. Blann*, 2013 Ark. App. 750, in which this court affirmed a finding that two adult stepsons were not entitled to share money from a wrongful-death settlement because the deceased had not stood in loco parentis to them. We noted that a warm relationship existed between the deceased and the appellants, as evidenced in part by the testimony of both stepsons, but "at no time did Mr. Blann assume the role or responsibilities of a parent with regard to either appellant." *Id*. at 4.

In our view, this case is more like the cases in which an in loco parentis relationship has been affirmed: *Robinson v. Ford-Robinson*, 362 Ark. 232, 208 S.W.3d 140 (2005) and *Bethany v. Jones*, 2011 Ark. 67, 378 S.W.3d 731. As this court explained in *Walchli*: "In both *Bethany* and *Robinson*, the petitioner's relationship to the child was as a primary caregiving parent. In both cases, the child had only one custodial, biological parent along with the petitioning, nonbiological co-parent. The petitioner in both cases stood in the place of a parent to the child." 2011 Ark. App. 170, at 8, 382 S.W.3d 683, 688. Here, Moore's husband had full custody of M.M., Moore took care of M.M. during the years that she and Ron dated, and the child lived with Moore and her husband as a family unit after they were married. M.M.'s testimony, which the circuit court credited, further supports that court's decision. Given the evidence presented to the circuit court, we hold that the court did not clearly err in finding that an in loco parentis relationship existed and affirm the visitation order.



Affirmed.

HIXSON and HOOFMAN, JJ., agree.

*Jones Law Firm*, by: *F. Parker Jones III*, for appellant.

*Hilburn, Calhoon, Harper, Pruniski & Calhoun, LTD*, by: *Traci LaCerra*, for appellee.