

# ARKANSAS COURT OF APPEALS

DIVISION I

**No.** CV–16–612

|  |  |  |
|---|---|---|
| TABITHA MCCRILLIS | APPELLANT | **Opinion Delivered:** April 12, 2017 |
|  |  | APPEAL FROM THE PULASKI COUNTY CIRCUIT COURT, THIRD DIVISION [NO. 60DR–15–2647] |
| V. |  |  |
| SARAH HICKS | APPELLEE |  |
|  |  | HONORABLE CATHLEEN V. COMPTON, JUDGE |
|  |  | AFFIRMED IN PART; REVERSED IN PART; REMANDED IN PART |

## BART F. VIRDEN, Judge

Tabitha McCrillis appeals from the order of the Pulaski County Circuit Court granting joint custody and visitation to her former domestic partner, Sarah Hicks. McCrillis argues the following points on appeal. First, McCrillis argues that the circuit court erred in finding that Hicks stood in loco parentis to McCrillis's biological child, C.H., and the circuit court erred when it granted Hicks visitation and joint custody pursuant to its finding of Hicks's in loco parentis status. Second, McCrillis asserts that the circuit court erred when it found that she was equitably estopped from denying Hicks visitation with C.H. Third, McCrillis contends that the circuit court erred in ordering that child-support payments from Hicks be placed in an educational trust.

We affirm the circuit court's determination that Hicks stood in loco parentis to C.H. We reverse the circuit court's award of joint custody, and we affirm on the issue of visitation.

We affirm the circuit court's finding that McCrillis is equitably estopped from denying Hicks visitation with C.H. We reverse the circuit court's order that child support be paid into an educational trust, and we remand the issue of child support for the circuit court to resolve in a manner consistent with this opinion.

## I. *Factual History*

In 2012 Tabitha McCrillis and Sarah Hicks, who were domestic partners at the time, decided that they wanted to have a child together. Through an in-home artificial-insemination kit and sperm from a bank, McCrillis became pregnant, and on December 17, 2013, C.H. was born. Prior to C.H.'s birth, the parties retained an attorney who drew up wills for the parties, set up a trust for the benefit of the child, and created a "Domestic Partnership Agreement" (agreement), which specified, among other things, how the parties would divide their time with C.H. if the parties terminated their relationship.

In the spring of 2015, McCrillis and Hicks separated, and by June their domestic partnership had ended. At first, the parties followed the visitation schedule set forth in the agreement; however, shortly thereafter, McCrillis began limiting Hicks's visitation with C.H. On June 23, 2015, Hicks filed a complaint in the Pulaski County Circuit Court requesting that the court enforce the agreement based on equitable promissory estoppel, and she requested that the court establish joint custody and visitation. In her petition Hicks alleged that she and McCrillis had agreed that, in the event their relationship ended, they would share joint custody of C.H. Hicks argued that McCrillis had recently refused to allow her to have substantial visitation with the child, which was contrary to their agreement that dealt with not only custody and visitation, but also financial plans, tax issues, educational

support, and many other child-rearing issues in great detail. Hicks argued that the agreement and other evidence showed that she stood in loco parentis to C.H.

On July 27, 2015, McCrillis responded that there was no legally binding or enforceable contract and that Hicks did not stand in loco parentis; thus, McCrillis argued, it was not in the child's best interest to grant Hicks's petition.

On the morning of September 9, 2015, McCrillis filed a memorandum to the court. In the memorandum, McCrillis asserted that Hicks did not assert or prove that McCrillis was an unfit parent, and therefore, it was a violation of her Fourteenth Amendment rights to award Hicks custody and visitation. McCrillis also argued that Hicks did not have a sufficient bond with C.H. such that she could be found to be standing in loco parentis to the child, and for that reason as well, it was not in the best interest of the child to award visitation to Hicks.

There was a hearing on the matter later that day. At the hearing, Hicks testified that she and McCrillis had talked about having a child early in 2012 and that they eventually chose a sperm donor from a bank in Washington. Hicks testified that they intentionally chose a donor with Hicks's eye and hair color with the idea that the child would resemble her. The parties used joint funds to pay for the in-home insemination kit and sperm. Hicks explained that she took time off from work to "hit the fertility window" and that she inseminated McCrillis. Hicks testified that she went to every obstetric appointment with McCrillis and that she read to C.H. and played music for her while McCrillis was pregnant. The parties named C.H. after Hicks's mother and gave the child Hicks as her surname. Hicks testified that before the child was born, they hired an attorney to draw up a

guardianship document. The document set forth that Hicks would become C.H.'s guardian if anything were to happen to McCrillis, and that if the domestic partnership ended, they would share custody of C.H. as though she were Hicks's biological child. Hicks testified that she participated in C.H.'s delivery and that her hospital armband identified her as C.H.'s parent. Hicks testified that she shared all parenting responsibilities except for breastfeeding and that she fed C.H. with a bottle to supplement the child's feeding. Hicks helped choose the daycare, signed the day-care documents as a parent, and shared the responsibility of dropping C.H. off and picking her up. When C.H. was sick, Hicks and McCrillis alternated who would stay home with the child. Hicks presented video to the court that had been recorded at different times and showed her playing with and caring for C.H.

Hicks explained that immediately after McCrillis informed her that she wanted to separate, the parties followed a weekly visitation schedule that allowed McCrillis to keep C.H. four nights a week, with Hicks having visitation the other three nights. That arrangement continued until sometime in late May when McCrillis cut back Hicks's time with the child to two nights a week. In June, McCrillis limited Hicks's visitation to four hours once per week. On June 30, 2015, McCrillis disallowed all contact between Hicks and C.H.

The court ruled from the bench that Hicks stood in loco parentis to C.H. and that "custody and visitation will resume" as it had been—four days and nights with McCrillis and three days and nights with Hicks. McCrillis's motion to dismiss was denied.

On September 15, 2015, Hicks filed a motion to set a visitation schedule. Hicks explained that she and McCrillis could not reach an agreement regarding visitation, and she

requested that the court set visitation. McCrillis responded, reiterating her argument that allowing Hicks to have visitation with C.H. constituted a violation of McCrillis's Fourteenth Amendment rights. McCrillis also requested that the circuit court reconsider its finding that Hicks stood in loco parentis, and McCrillis petitioned the court to stay visitation.

On September 16, 2015, Hicks responded that she and McCrillis had always intended for Hicks to be a parent to C.H., that she and C.H. had formed a strong bond, and that she stood in loco parentis to C.H.

On September 22, 2015, the circuit court set a visitation schedule and granted McCrillis's motion to reconsider. In the order, the circuit court set forth that Hicks would pick up the child from daycare on Friday afternoons, and return the child to day care on Monday mornings. The order stated that McCrillis would pick up the child from day care on Monday afternoons, and C.H. would remain in her care until she dropped her off at daycare on Friday mornings. The circuit court ordered that this schedule would remain in effect until further notice. The circuit court also ordered Hicks to pay $225 biweekly in child support.

On September 28, 2015, McCrillis filed a motion to vacate the visitation order. McCrillis argued that there was no bond between Hicks and C.H. and that to order visitation would be introducing a "legal stranger" into the child's life. Hicks responded that McCrillis's statements about the lack of a bond between her and the child were "disingenuous" and that she was a parent in all respects. The circuit court denied the motion to vacate on October 2, 2015.

On October 7, 2015, the circuit court held the second hearing on the matter. Eddie Keathley, a friend of Hicks and McCrillis's, testified that both women were committed to becoming parents and that Hicks was "in on it from the very beginning and still is." Keathley testified that Hicks and McCrillis both are called "mama" and that during a recent visitation with Hicks, C.H. responded to Hicks by reaching for her and smiling at her.

McCrillis also testified at the hearing. She explained that she and Hicks had decided that they wanted to have a baby together and that they had planned on raising the child together. McCrillis testified that Hicks participated in "skin-on-skin" bonding to help C.H. gain weight and that Hicks took two weeks off from work after the baby had been born. When McCrillis went back to work, Hicks took one week off to be home with C.H. before she started day care.

McCrillis controverted Hicks's testimony concerning her parental role. McCrillis testified that Hicks helped with feedings but that Hicks did not want to get up in the night with the baby and that she complained about having to do so. She testified that Hicks did not want to hold C.H. when she cried, and that the bond between Hicks and C.H. diminished as time went on because Hicks was resentful of C.H. and blamed the child for the relationship problems they were having. McCrillis testified that after visitation with Hicks C.H. exhibited unusually defiant behavior, that she was very clingy to McCrillis, and that C.H. ate much more than usual.

Hicks testified that she had bonded with C.H., and she disagreed with McCrillis's testimony that she did not willingly participate in the day-to-day aspects of child care. Hicks testified that she got up in the mornings to see C.H. before day care, even when she had

worked late. Hicks testified about providing daily routine care for C.H. and taking care of C.H.'s medication for her frequent ear infections. Hicks explained that she did not resent C.H. for the problems in the parties' relationship. Hicks testified that she also noticed that C.H. had been eating more than usual and that she adequately fed C.H. when she was in her care. Hicks testified that C.H. had been unusually clingy to her as well at daycare drop-off.  At the hearing, Hicks testified that, though she and McCrillis had hired an attorney to write a domestic-partnership agreement, the agreement had never been signed by the parties. Hicks again testified that she took off work to be with the baby before she began daycare, she took care of C.H. by feeding, bathing, playing with her, and caring for her "just as a mother does." Hicks produced and explained many pictures of C.H. and her celebrating milestones and holidays. Hicks testified that after the domestic partnership had ended, McCrillis eventually refused to allow Hicks to have visitation with C.H.

McCrillis's mother, Teresa Sale, testified at the hearing, stating that she did not believe Hicks was a nurturing person and that she did not believe there was a parent–child bond between Hicks and C.H.

On October 26, 2015, McCrillis requested a Rule 54(b) certificate to allow her to immediately appeal the circuit court's determination that Hicks stood in loco parentis and its award of visitation. The circuit court denied the motion.

On March 17, 2016, the circuit court held a third, and final, hearing. The court allowed the introduction of numerous plaintiff's exhibits—prior testimony demonstrating the bond between Hicks and C.H. At the hearing, John Aquilino, a former coworker of Hicks and McCrillis's, testified that there was no question in his mind that Hicks was C.H.'s

SLIP OPINION

mother and that it was common knowledge around the office that Hicks and McCrillis were the parents of C.H. Eddie Keathley testified again that he had understood before C.H. was born that Hicks and McCrillis intended to be parents together. Keathley testified that since the separation he had observed C.H. and Hicks together and that he had observed Hicks behaving in an attentive and parental fashion. Dawn Doray, a clinical psychologist, testified at the hearing that once a child has developed an attachment to a parent-figure, it is in the child's best interest to maintain that relationship. Katie Bodenhamer, the attorney Hicks and McCrillis hired before C.H. was born, testified that she had been engaged to do some estate-planning work in light of the fact that they were about to become parents. Bodenhamer testified that she prepared a guardianship document for the couple so that "in the event that something were to happen with Tabitha," Hicks would become C.H.'s legal guardian. Bodenhamer testified that she believed she had drafted documents for the couple in order for them to fulfill their intent to co-parent the child because "same-sex marriage wasn't on the table. It wasn't something they could do."

Barbara Ann Bland Van Horn, Hicks's sister-in-law, testified about Hicks's and McCrillis's intent to become parents. She testified that Hicks took an active role in getting ready for the baby and maintained that parenting role throughout C.H.'s life. Van Horn described Hicks's parenting style and attention to C.H.'s safety and routine.

McCrillis moved to dismiss the case. McCrillis argued that the parties' intent to raise the child together was immaterial and that custody rights could not be subject to contract principles such as equitable estoppel. McCrillis also argued that Hicks did not stand in loco parentis to C.H., and thus, Hicks did not have standing to bring the suit. McCrillis reiterated

her argument that she had not been found to be unfit. Hicks responded that promissory estoppel did apply under these facts and that the best interest of the child was of paramount concern. Hicks argued that her in loco parentis status had been established by the testimony and the evidence.

McCrillis called several rebuttal witnesses who testified that Hicks was not bonded to C.H. and that the difficulties in Hicks's and McCrillis's relationship were due to Hicks's controlling behavior and her lack of interest in raising a child. McCrillis testified she felt like she was C.H.'s only parent and that even though Hicks had participated in the care of C.H. at times, "that doesn't make her a parent."

The final custody order was entered on April 15, 2016. The circuit court found that Hicks had stood in loco parentis when she began this suit, that both parents are fit, that the best interest of the child is the overriding factor in custody and visitation cases, and that it is in C.H.'s best interest to have both parents in her life. The circuit court found that McCrillis was equitably estopped from denying Hicks the ability to co-parent and made extensive findings of fact supporting that decision. The circuit court awarded joint custody to Hicks and McCrillis, with primary physical custody to McCrillis, and it ordered the parties to observe the visitation schedule set in 2015. Hicks was ordered to pay child support directly into an educational trust that would be awarded to C.H. when she turns eighteen or when she graduates from high school, whichever is later. The circuit court ordered that Hicks would determine the best use of that money. McCrillis filed a timely notice of appeal.

II. *Points on Appeal*

A. In Loco Parentis

We first address McCrillis's assertion that the circuit court erred in finding that Hicks stood in loco parentis. Our court recently dealt with the issue in *McKenzie v. Moore*, 2015 Ark. App. 6, at 5, 453 S.W.3d 686, 689:

> The Latin phrase, "in loco parentis," literally translated, means "in the place of a parent.'" This court has defined in loco parentis as "in place of a parent; instead of a parent; charged factitiously with a parent's rights, duties, and responsibilities." A person who stands in loco parentis to a child puts himself or herself in the situation of a lawful parent by assuming the obligations incident to the parental relation without going through the formalities necessary to a legal adoption. This relationship involves more than a duty to aid and assist, and more than a feeling of kindness, affection, or generosity.
>
> . . . In loco parentis refers to a person who has fully put himself in the situation of a lawful parent by assuming all the obligations incident to the parental relationship and who actually discharges those obligations. . . . In making a determination as to whether a nonparent stands in loco parentis, courts consider the totality of the circumstances and do not lightly infer the intent of the person seeking to be considered as standing in loco parentis. While the length of time a person spends with a child is not determinative, it is a significant factor in considering whether that person intended to assume parental obligations or has performed parental duties.

(Internal citations omitted.)

A nonparent has no standing to petition for custody or visitation where the nonparent does not stand in loco parentis to the child at the time of the petition. *Foust v. Montez-Torres*, 2015 Ark. 66, at 7, 456 S.W.3d 736, 740. The doctrine of in loco parentis focuses on the relationship between the child and the person asserting that he or she stood in loco parentis. *Bethany v. Jones*, 2011 Ark. 67, at 10, 378 S.W.3d 731, 737. Our supreme court has long held that the in loco parentis relationship terminates once the surrogate parent "has established his home at another place, and indicated his purpose thereby to no longer treat

them as part of his family." *Foust*, 2015 Ark. 66, at 4, 456 S.W.3d at 738 (citing *Kempson v. Goss*, 69 Ark. 451, 64 S.W. 224 (1901)).

In *Foust*, the Arkansas Supreme Court limited the doctrine of in loco parentis by allowing the biological parent to sever the in loco parentis relationship when the nonbiological parent had not lived with the child for an extended period of time. In *Foust*, our supreme court held,

> [T]he natural parent must also be permitted to terminate the relationship at will, lest the law improperly prioritize the rights of the nonparent above that of the natural parent. As the Utah Supreme Court has explained, "Such an inequitable result, which would prioritize the rights of the surrogate parent over the needs of the child, demonstrates that the in loco parentis doctrine does not contemplate a perpetual grant of rights and is, in fact, ill-suited to convey such rights." *Jones v. Barlow*, 154 P.3d 808, 814 (Utah 2007). In short, because Foust had not lived with the child for over three years, Foust could not stand in loco parentis to M.F.

*Foust, supra*, 2015 Ark. 66, at 5, 456 S.W.3d at 738–39. Based on Foust's lack of contact with the child, the Arkansas Supreme Court upheld the circuit court's decision that she did not stand in loco parentis to the child.

McCrillis argues that *Foust* is analogous to the case at bar; however, the instant case is distinguishable from *Foust* in several important ways. First, Foust had not lived with the child with whom she sought visitation for over three years at the time she filed her request, whereas the cohabitation between Hicks and McCrillis had only recently ended. Second, the biological parent fully terminated all contact between Foust and the child prior to Foust's filing her complaint. Here, Hicks had, at the beginning of the parties' separation, exercised extensive visitation—three full days per week—and Hicks was still exercising visitation with C.H. when she filed her petition, though it had been limited by McCrillis at the time of filing. Furthermore, the circuit court in *Foust* determined that although Foust had stood in

loco parentis to the child for the first three years of the child's life, she had ceased to have that bond with the child, and it was no longer in the child's best interest to allow visitation. In the instant case, based on extensive testimony and evidence, the circuit court determined that there was a strong bond between C.H. and Hicks and that it would not be in the best interest of the child to sever that bond.

The present case is analogous to *Bethany*, *supra*, which McCrillis admits was not overruled by the holding in *Foust*. In *Bethany*, a same-sex couple had made the decision to have a child together. As in our present case, Bethany became pregnant through artificial insemination, and after the child was born the couple co-parented the child. The child called both parties "mama" and "mommy" and the child had been given both grandmothers' names. In *Bethany*, the appellee had been a stay-at-home parent to the child, whereas in the instant case, there was testimony that Hicks fully participated in the daily care of C.H. and had been equally involved in choosing the day care facility that C.H. attended. As in *Bethany*, the child in this case was close to the appellee's extended family. The appellee in *Bethany* testified that she and Bethany had an oral agreement that they would raise the child together, but that they never had any discussions about what would happen if they ended the relationship. In the instant case, the parties went a step further and consulted an attorney who helped them prepare for any possible dissolution of their relationship or the death of the biological parent. Though the domestic agreement had not been signed, the terms of the document had been created by both parties through an attorney, and the circuit court determined that the agreement demonstrated the parties' commitment to co-parenting around the time of the child's birth.

In *Bethany*, our supreme court held that the circuit court did not clearly err in finding that the biological mother's former same-sex partner stood in loco parentis to the child for visitation purposes and that it was in child's best interest to have visitation with the mother's former partner who stood in loco parentis to child. McCrillis attempts to distinguish the present case from *Bethany* and argues that the circuit court's finding of in loco parentis was based on testimony that the appellee had been a stay-at-home caregiver for the child for three-and-a-half years prior to termination of the parties' relationship, whereas Hicks and McCrillis's relationship ended when C.H. was sixteen months old. Hicks, like McCrillis, was employed full-time; therefore, Hicks had not proved that she had formed a sufficient bond with C.H. for the circuit court to properly determine that she stood in loco parentis. We find her argument unpersuasive.

At each of the three hearings, there was extensive testimony from Hicks and other witnesses supporting Hicks's assertion that she had a strong bond with C.H. and was in all respects acting as the child's parent. The circuit court weighed the testimony presented and considered the evidence regarding the parent-child relationship between Hicks and C.H. to determine that Hicks stood in loco parentis. As we stated above, we give due deference to the circuit court's ability to view and judge the credibility of the witnesses. *Hunt, supra.* Accordingly, in light of the testimony presented concerning Hicks's active parenting and bonding with C.H., and the circuit court's careful consideration of that testimony, we hold that the circuit court did not err in finding that Hicks stood in loco parentis to C.H.

B. Fourteenth Amendment Right of Biological Parents to Govern Care of Children

*1. Custody*

We now turn to the constitutional issue presented in this case. McCrillis argues that as the fit, biological parent of C.H., she is guaranteed by the Fourteenth Amendment the right to govern the care, custody, and control of her child. McCrillis contends that the circuit court violated her Fourteenth Amendment rights when it awarded joint custody and visitation to Hicks, who was not the biological parent of the child, without finding McCrillis to be unfit. We must agree with McCrillis that the circuit court erred in awarding custody to Hicks, and we reverse.

This court has traditionally reviewed matters that sound in equity de novo on the record with respect to factual questions and legal questions. *Daniel v. Spivey*, 2012 Ark. 39, 386 S.W.3d 424. We will not reverse a finding made by the circuit court unless it is clearly erroneous. *Id.* We have further stated that a circuit court's finding is clearly erroneous when, despite supporting evidence in the record, the appellate court viewing all of the evidence is left with a definite and firm conviction that a mistake has been committed. *Id.* We give due deference to the superior position of the circuit court to view and judge the credibility of the witnesses. *Hunt v. Perry*, 357 Ark. 224, 162 S.W.3d 891 (2004). This deference to the circuit court is even greater in cases involving child custody or visitation, as a heavier burden is placed on the circuit court to utilize to the fullest extent its powers of perception in evaluating the witnesses, their testimony, and the best interest of the children. *Alphin v. Alphin*, 364 Ark. 332, 219 S.W.3d 160 (2005).

14

Even giving due deference to the circuit court's discretion regarding the best interest of the child, we cannot uphold the circuit court's decision regarding custody. The Due Process Clause of the Fourteenth Amendment protects the rights of parents to direct and govern the care, custody, and control of their children. *See Troxel v. Granville*, 530 U.S. 57 (2000) (declaring Washington State's grandparent-visitation act unconstitutional as applied); *see also Linder v. Linder*, 348 Ark. 322, 72 S.W.3d 841 (2002) (holding that Arkansas's grandparent-visitation statute was unconstitutional as applied where it violated a mother's fundamental liberty interest under the Due Process Clause to parent her child).

Put simply, without a finding of parental unfitness, our courts have never abrogated the custody rights of a biological parent, and we cannot uphold the circuit court's decision to do so now. In *Stamps v. Rawlins*, 297 Ark. 370, 372, 761 S.W.2d 933, 935 (1988), our supreme court upheld the lower court's decision that a stepparent stood in loco parentis to the son of his ex-wife but reversed the circuit court's decision to award custody to the appellee. Upon the divorce of the parties, the court awarded "split-custody" to both the father of the child and to the father's ex-wife. As in the present case, each party was found to be fit to take care of the child. Our supreme court acknowledged that stepparents could be awarded custody of a child, but it also held:

> Nevertheless, our case law specifically establishes a preference for natural parents in custody matters, and provides that the preference must prevail unless it is established that the natural parent is unfit. The court of appeals followed this preference in a case very similar to the one at bar.
>
> Here, the chancellor specifically found that the appellant mother was a fit and proper person for custody. Our de novo review of the record sustains that finding. Therefore, custody of Ryan should have been left in the appellant, and it was error for the court to rule otherwise. It makes no difference that split custody, rather than full custody, was awarded.

(Internal citations omitted.)

Hicks makes no argument that McCrillis is an unfit parent and indeed praises McCrillis's capability as a mother. The circuit court found McCrillis to be fit; therefore, in accordance with our caselaw we hold that the circuit court's decision to award custody to Hicks was in error, and on this point we reverse. Since this case began, the law regarding same-sex marriage has changed; however, at the time this case arose, marriage was not an option for the parties, and it is not a factor in this case. Despite a change in the legal landscape, we are constrained to follow the 1988 caselaw.[1]

## 2. *Visitation*

McCrillis also argues that the circuit court's award of visitation to Hicks was an impermissible abrogation of her Fourteenth Amendment rights. We disagree, and on this point we affirm.

Our supreme court has determined that a parent's Fourteenth Amendment right to govern the care of a child is subject to the best interest of the child. In *Robinson v. Ford-Robinson*, 362 Ark. 232, 239, 208 S.W.3d 140, 143 (2005), our supreme court held that the circuit court did not err in awarding visitation to a stepparent who stood in loco parentis to her stepson because it was in the child's best interest to continue to have a relationship with the person he considered to be his mother in all respects.

---

[1]In *Obergefell v. Hodges*, 135 S. Ct. 2584 (2015), the United States Supreme Court held that the right to marry is a fundamental right inherent in the liberty of the person, and under the Due Process and Equal Protection Clauses of the Fourteenth Amendment same-sex couples may not be deprived of that right and that liberty.

While the instant case does not arise out of a divorce proceeding, it is similar to *Robinson* in that the circuit court found that Hicks stood in loco parentis to C.H., and after determining that it was in the best interest of the child to have both parents in her life, awarded visitation based on the bond between C.H. and Hicks.

As in *Bethany*, the circuit court first made a determination that the non-biological parent stood in loco parentis and then determined that based on that bond, visitation was appropriate. Clearly, the circuit court weighed the testimony presented and considered the evidence regarding Hicks's role of parent to C.H., the bond formed between the two, and the child's relationships with Hicks's extended family, to determine that it was in C.H.'s best interest to allow visitation. As we previously stated, we give due deference to the circuit court's ability to view and judge the credibility of the witnesses. *Hunt*, *supra*. Accordingly, we cannot say that the circuit court erred in ruling that it was in C.H.'s best interest to have visitation with Hicks.

Before leaving this point, we note that McCrillis urges this court to reverse the decision of the Arkansas Supreme Court in *Bethany*. The Arkansas Court of Appeals is not at liberty to overturn a decision of the Arkansas Supreme Court. *See Metcalf v. Texarkana Sch. Dist.*, 66 Ark. App. 70, 73, 986 S.W.2d 893, 894 (1999).

### C. Equitable Estoppel

McCrillis argues that the circuit court erred in finding that she was equitably estopped from denying Hicks her promised role as a coparent to C.H. We disagree, and on this issue we affirm.

SLIP OPINION

Our supreme court has defined equitable estoppel as "a judicial remedy by which a party may be precluded by its own act or omission from asserting a right to which it otherwise would have been entitled, or pleading or proving an otherwise important fact." *Chitwood v. Chitwood*, 92 Ark. App. 129, 141, 211 S.W.3d 547, 554 (2005) (quoting *R.N. v. J.M.*, 347 Ark. 203, 216, 61 S.W.3d 149, 157 (2001)). The elements of equitable estoppel are (1) the party to be estopped must know the facts; (2) the party must intend that its conduct shall be acted on or must so act that the party asserting estoppel had a right to believe the other party so intended; (3) the party asserting estoppel must be ignorant of the facts; and (4) the party asserting estoppel must rely on the other party's conduct to his or her detriment. *Chitwood*, 92 Ark. App. at 138, 211 S.W. 3d at 552.

The circuit court found that McCrillis engaged in acts that precluded her from asserting equitable estoppel to withhold visitation from Hicks. Specifically, the circuit court found that McCrillis and Hicks had planned for and conceived C.H. with the understanding that both parties would be parents to the child. The circuit court cited testimony from both parties that McCrillis made promises to Hicks regarding her role as a parent in the event that the parties ended their relationship. The circuit court noted the testimony of the attorney who wrote up the paperwork for the parties concerning Hicks's parental relationship with C.H., and the circuit court made an extensive list of pertinent findings. Among these findings, the court set forth that Hicks and McCrillis decided to have a baby together and intentionally chose a donor that had features similar to Hicks's. Hicks impregnated McCrillis, the parties agreed to name the baby after both of their grandmothers, and the parties gave the child Hicks's surname. Both McCrillis and Hicks were named as

SLIP OPINION

the parents at the baby shower and at the "reveal" party. Items for the baby were purchased with joint funds. Both McCrillis and Hicks took time off of work to be home with the baby immediately after she was born, and they coparented the child the first 15 months of her life. Each party's extended family had been very involved in C.H.'s life. Initially, when the domestic partnership ended, the parties followed the written parenting schedule that had been devised around the time of C.H.'s birth, and McCrillis unilaterally withdrew Hicks's visitation with C.H.

We give due deference to the circuit court's credibility determinations, and we hold that the circuit court's extensive findings clearly show that the elements of estoppel as to the issue of visitation were established. We find no error, and on this point we affirm.

### D. Child Support

McCrillis argues that the circuit court erred when it ordered Hicks to pay into an educational trust in lieu of child support. We agree, and we reverse and remand with instructions to award child support consistent with this opinion.

The standard of review for an appeal from a child-support order is de novo, and this court will not reverse a finding of fact by the circuit court unless it is clearly erroneous. *Gilbow v. Travis*, 2010 Ark. 9, at 4, 372 S.W.3d 319, 321. In reviewing a circuit court's findings, the appellate court gives deference to the circuit court's superior position to determine the credibility of the witnesses and the weight to be accorded to their testimony. *Id.* Child support is not to provide for the accumulation of capital by children but is to provide for their reasonable needs. *Smith v. Smith*, 341 Ark. 590, 596, 19 S.W.3d 590, 594–95 (2000). From the testimony at the hearing, it appears that the circuit court may have

resorted to an educational trust when McCrillis refused to accept Hicks's payments of child support; however, McCrillis requests on appeal that child-support payments be reinstated, and we agree with her current position that child-support funds should be available for use concerning the day-to-day needs of C.H.

Affirmed in part; reversed in part; remanded in part.

ABRAMSON and GLADWIN, JJ., agree.

*LaCerra, Dickson, Hoover & Roger, PLLC*, by: *Lauren White Hoover*, for appellant.

*Coplin & Hardy, PLLC*, by: *Betty J. Hardy*, for appellee.